## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**NETJETS LARGE AIRCRAFT, INC.**
**et al.,**

                **Plaintiffs,**

        **-vs-**

**UNITED STATES OF AMERICA,**

             **Defendant.**

**Case No. 2:11-cv-1023**

**Judge Sargus**

**Magistrate Judge Kemp**

## MOTION OF PLAINTIFFS NETJETS AVIATION, INC., NETJETS LARGE AIRCRAFT, INC. AND NETJETS INTERNATIONAL, INC. FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiffs NetJets Aviation, Inc., NetJets Large Aircraft, Inc., and NetJets International, Inc. respectfully move the Court for summary judgment on all claims and counterclaims in this case. The grounds supporting this motion are set forth in the attached memorandum.

                Respectfully submitted,

                /s/ John W. Zeiger
                John W. Zeiger  (0010707), Trial Attorney
                Bradley T. Ferrell (0070965)
                ZEIGER, TIGGES & LITTLE LLP
                41 South High Street, Suite 3500
                Columbus, Ohio 43215
                Telephone:  (614) 365-9900
                Facsimile:   (614) 365-7600
                Email:  zeiger@litohio.com
                     ferrell@litohio.com

                Attorneys for Plaintiffs and Counterclaim
                Defendants NetJets Large Aircraft, Inc.,
                NetJets International, Inc., and
                NetJets Aviation, Inc.

Colleen K. Nissl (0008155)
Senior Vice President and General Counsel
NetJets, Inc.
4111 Bridgeway Avenue
Columbus, Ohio 43219
Telephone: (614) 239-2934
Facsimile: (614) 239-3632
Email: cnissl@netjets.com

Co-Counsel for Plaintiffs and Counterclaim Defendants

**TABLE OF CONTENTS**
**AND**
**SUMMARY OF POINTS AND AUTHORITIES**

**PAGE**

I.  SUMMARY OF ARGUMENT ........................................................................................ 1

    1.  NetJets Does Not Sell "Transportation" ...................................................... 2

    2.  NetJets' Monthly Management Fee Is Not An "Amount Paid" For Air
        Transportation Under Section 4261 ............................................................. 4

    3.  The IRS's Retroactive Assessments Are Unlawful Under Established
        IRS Regulations And Revenue Procedures ................................................. 5

    4.  The IRS's Retroactive Assessments Are Unlawful Under Supreme Court
        Precedent ...................................................................................................... 8

II.  STATEMENT OF THE FACTS ................................................................................... 9

    A.  The Plaintiffs In This Case .......................................................................... 9

    B.  History Of NetJets ...................................................................................... 10

    C.  The NetJets Fractional Ownership Program .............................................. 11

    D.  The Fractional Owners Who Use NetJets' Management Services
        Are *Bona Fide* Owners Of Their Aircraft .................................................. 13

    E.  NetJets Acts As Agent For The Aircraft Owners ...................................... 15

    F.  The IRS's 1992 Technical Advice Memorandum ...................................... 15

    G.  The IRS Denies EJA's Administrative Claims For Refund Of Section
        4261 Taxes But Acknowledges That EJA's Collection Of The Tax On
        Occupied Hourly Fees Only Is "Correct" Under Section 4261 ................... 19

    H.  EJA Files Suit Challenging The IRS's Application Of The Section
        4261 Tax ..................................................................................................... 20

    I.  The Federal Aviation Administration Promulgates Regulations
        That Treat And Regulate Fractional Management Programs As
        Private Aviation ........................................................................................... 22

J.      The IRS Retroactively Assesses Section 4261 Taxes Against NetJets' Monthly Management And Fuel Variable Surcharge Fees ................................................... 25

K.      Congress Clarifies And Reaffirms That, Under Existing Law, The IRS's Position Is Wrong – Fractional Aircraft Ownership Programs Are Not Subject To The Ticket Tax ...................................................................................................... 26

L.      The IRS Treats NetJets' Competitors More Favorably Than It Is Treating NetJets ................................................................................................ 27

III.      THE CLAIMS AND COUNTERCLAIMS AT ISSUE IN THIS CASE ..................... 28

IV.      LAW AND ARGUMENT ............................................................................................ 29

A.      NetJets Does Not Provide "Taxable Transportation" Under Section 421 ....... 29

1.      The Relevant Statutory Text and Structure Make Clear That The Ticket Tax Applies Only To The Sale Of Commercial Flights, Not Management Services Supporting Private Aircraft Usage ............ 29

Section 4261 of the Internal Revenue Code imposes a tax on "the amount paid for taxable transportation of any person …." 26 U.S.C. § 4261. "Taxable transportation" is defined by section 4262 of the Code as "transportation by air …." While the definition of "taxable transportation in section 4261 and 4262 does little to clarify the meaning of the term, other language in those statutes, and in other related statutes in the Internal Revenue Code, makes clear that Congress intended "taxable transportation" to mean the sale of commercial airline or charter flights. Private aircraft owners such as those who participate in NetJets' fractional management program are not subject to the commercial-transportation tax in section 4261; rather, they pay a separate tax on the fuel that is purchased for their aircraft.

2.      The Legislative History Confirms That The Ticket Tax Was Intended To Apply Only To The Sale Of Commercial Transportation And Not To The Costs Of Support Services Purchased By Private Aircraft Owners ...................................................................................... 31

Congress' intent for section 4261 to apply only to the sale of commercial flights is reinforced by a review of the legislative history. Congress has repeatedly stated that the ticket tax in section 4261 applies to "commercial transportation," whereas the fuel tax applies to "general" or "private" aviation.

In fact, in 2011, while considering an amendment to the Internal Revenue Code addressing the specific issue in this case – the IRS's improper treatment of fractional aircraft ownership as commercial aviation – the Senate Finance Committee expressly stated the amendment was necessary to "make clear" that fractional aircraft owners who travel privately on their own planes are engaged in "noncommercial aviation" to which the section 4261 tax does not apply. In February 2012, Congress passed the amendment the Senate Finance Committee had considered the year before, and, in doing so, explained that it was "clarifying and

reaffirming" the existing law in specifying that fractional aircraft owners who travel privately on their own planes are subject to the separate "fuel tax" on noncommercial aviation, not the "ticket tax" in section 4261.

3. **Any Ambiguity As To Whether "Taxable Transportation" Is Broad Enough To Sweep In Support Services For Privately Owned Aircraft That Are Provided By NetJets Must, As A Matter Of Law, Be Resolved In Favor Of NetJets And The Aircraft Owners It Supports** ............................................................................................... 34

The text, statutory structure and legislative history of section 4261 makes clear that Congress never intended that it apply to payments by private aircraft owners for support services of the kind provided by NetJets. Those services simply do not constitute "taxable transportation" under section 4261. But even if there were an equally plausible definition of "taxable transportation" that was broad enough to sweep in private aircraft maintenance and support services, the tax could not be imposed on payments for such support services because the ambiguity in the statue must be construed in the manner most favorable to the NetJets – that the section 4261 does not apply to payments it receives for aircraft support services it provides to private aircraft owners. *See Miller v. Standard Nut Margarine Co.*, 284 U.S. 498 (1932); *United States v. Merriam*, 263 U.S. 179 (1923); *United States v. King Trailer Co.*, 350 F.2d 947 (9th Cir. 1965).

4. **The IRS's Own Revenue Ruling Provides That The Payments A Private Aircraft Owner Makes For Maintenance And Operational Support Such As That Provided By NetJets Are Not Subject To The Ticket Tax** ............................................................................................... 35

Consistent with the wording and legislative history of section 4261, the IRS itself issued a revenue ruling in 1958, Rev. Rul. 58-215, expressly holding that aircraft management services like those provided by NetJets do not constitute the provision of "taxable transportation," and thus are not subject to the tax under section 4261. That ruling, which is diametrically opposed to the position the IRS asserts in this case, further supports the conclusion that the section 4261 tax is simply in applicable to the payments private aircraft owners make to NetJets for assistance in personally using their own planes. As such, NetJets is entitled to summary judgment refunding and abating the IRS's unlawful imposition of section 4261 taxes against it.

5. **The *Executive Jet* Decision Relied Upon By The Government As Support For Imposing The Ticket Tax Was Not Good Law During The Assessment Period** ............................................................................................... 38

The IRS asserts that NetJets cannot reargue the applicability of section 4261 in this case because the issue was already decided by the Federal Circuit in *Executive Jet Aviation v. United States*, 125 F.3d 1463 (Fed. Cir. 1997) ("*Executive Jet*"). The *Executive Jet* decision is no longer good law, however, because the factual premises upon which the court relied in rendering that decision were completely eviscerated by the Federal Aviation Administration's promulgation of regulations ("FARs") in 2003 governing fractional aircraft ownership programs such as the

NetJets program.  The FARs establish, as a matter of federal law, that fractional aircraft ownership programs such as the NetJets program constitute private aviation, not commercial aviation. The *Executive Jet* decision therefore poses no obstacle to NetJets' entitlement to summary judgment in its favor. *See Commissioner v. Sunnen*, 333 U.S. 591 (1948).

**B.** **The Monthly Management Fee That Owners Pay To NetJets Is Not An "Amount Paid" For "Transportation" Under Section 4261** ....................... 39

Even assuming, *arguendo*, that the aircraft management services NetJets provides to private aircraft owners could be construed to be commercial air transportation (and they cannot be), NetJets still is entitled to summary judgment abating the section 4261 taxes the IRS retroactively assessed against the monthly management fees its fractional owners paid to it, because those fees are not *amounts paid for taxable transportation* under section 4261.  The monthly management fees paid by fractional owners have nothing to do with transportation, *i.e.* the actual flights that occur on fractionally-owned aircraft.  Rather, the monthly management fees cover costs associated with *ownership* of an aircraft, *i.e.* the costs a fractional owner must pay to maintain and support her aircraft *even if the aircraft is never flown*.  This is evidenced by the fact that fractional owners must pay the monthly management fee irrespective of whether, or how much, the owner uses the aircraft.

Indeed, although the IRS now attempts to impose the section 4261 tax on payments of monthly management fees, the Government expressly acknowledged, in the *Executive Jet* litigation, that the monthly management fee is not a payment for transportation services and thus is not subject to taxation under section 4261.

**C.** **The IRS's December 1992 TAM Prohibited It From Retroactively Assessing The Ticket Tax Against Monthly Management And Fuel Variable Surcharge Fees** .................................................................................... 41

The IRS's retroactive assessments against NetJets' monthly management and fuel variable surcharge fees are also barred by the IRS's own Treasury Regulations and Revenue Procedures.  On December 22, 1992, the IRS issued a technical advice memorandum (the "December 1992 TAM") as part of its examination of the excise tax returns of Executive Jet Aviation, Inc. ("EJA"), the predecessor to NetJets.  Under the December 1992 TAM, the IRS determined that the occupied hourly fees that fractional owners paid to EJA were the only fees subject to the section 4261 tax.

EJA filed the *Executive Jet* litigation challenging the IRS's position in the December 22, 1992 TAM.  During that litigation, the IRS repeatedly reconfirmed its position that, pursuant to the December 22, 1992 TAM, only the occupied hourly fees (and not the monthly management and fuel variable surcharge fees) were subject to the section 4261 tax.  The Federal Circuit ultimately agreed, affirming imposition of the section 4261 tax against the occupied hourly fee, and only the occupied hourly fee.  Thus, the December 1992 TAM is clear: the section 4261 tax, if it applies at all (and NetJets believes it does not, especially in view of the 2003 FARs), applies only to NetJets' occupied hourly fees and not its monthly management or fuel variable surcharge fees.

Under the IRS's own Treasury Regulations and Revenue Procedures, the IRS is bound to follow a TAM, and the taxpayer is entitled to rely on the TAM, until the TAM is withdrawn, modified, or revoked.  Here, the facts are undisputed that the IRS never withdrew, modified or revoked the December 1992 TAM. Thus, NetJets was entitled to rely on that TAM by collecting and remitting section 4261 taxes on only occupied hourly fees and not on monthly management or fuel variable surcharge fees.  And that is precisely what EJA, and then NetJets, did – they collected and remitted the section 4261 tax on occupied hourly fees only for seventeen years.

But then, in 2010, the IRS retroactively assessed more than $330 million in section 4261 taxes against NetJets' monthly management and fuel variable surcharge fees, despite the fact that the IRS had never withdrawn, modified or revoked the December 1992 TAM holding that only occupied hourly fees were subject to the tax.  Federal courts have repeatedly held that the IRS acts unlawfully when it retroactively assesses taxes against a taxpayer in violation of the retroactivity limitations in its own Treasury Regulations and Revenue Procedures. *See, e.g.*, *Lesavoy v. Commissioner*, 238 F.2d 589 (3d Cir. 1956); *Lansons, Inc. v. Commissioner*, 622 F.2d 774 (5th Cir. 1980); *Phillies v. United States*, 153 F. Supp. 2d 612 (E.D. Pa. 2001); *Thomas G. Faria Corp. v. United States*, 1977 WL 3812 (Fed. Cl. Ct. 1977)

As such, NetJets is entitled to summary judgment on its claims for abatement of the more than $330 million of section 4261 taxes the IRS retroactively assessed, contrary to the December 1992 TAM, against monthly management and fuel variable surcharge fees.

     **D.**     **NetJets Is Not Secondarily Liable For Payment Of The Section 4261 Tax On Monthly Management And Fuel Variable Surcharge Fees Because The IRS Failed To Meet Its Duty To Provide Clear Guidance That Those Fees Are Subject To The Tax** ........................................ 49

NetJets is entitled to summary judgment for a fourth separate and independent reason.  In addition to the IRS's legal duty to follow its position from the December 1992 TAM, the IRS also had an independent duty, based on Supreme Court precedent, to provide clear, advance guidance to NetJets that the IRS intended to apply the section 4261 tax to monthly management and fuel variable surcharge fees. *See Central Illinois v United States*, 435 U.S. 21 (1978).  The IRS, however, never provided any such guidance.  To the contrary, the December 1992 TAM itself, as well as the IRS's actions with respect to certain other fractional ownership industry members, provided that NetJets was not obligated to collect the section 4261 tax on its monthly management and fuel variable surcharge fees.

As a result of the IRS's failure to meet its legal obligation under *Central Illinois*, NetJets is facing hundreds of millions of dollars of retroactive assessments for failure to collect excise taxes that the IRS never told NetJets it had an obligation to collect.  This manifest unfairness alone – as recognized by the Supreme Court in *Central Illinois* – requires summary judgment in favor of NetJets on its claims for refund and abatement of the IRSs' retroactive assessments against monthly management and fuel variable surcharge fees, as well as the Government's corresponding counterclaim seeking to enforce those assessments.

**V.**     **CONCLUSION** ............................................................................................................. 53

## MEMORANDUM IN SUPPORT

### I.      Summary Of Argument

Section 4261 of the Internal Revenue Code imposes a 7.5% excise tax on "amounts paid" for "transportation by air."   This tax is imposed on the purchaser of the transportation, but section 4263 of the Code imposes secondary liability on the air carrier furnishing the transportation if it fails to collect the tax.

In December 1992, the IRS issued a technical advice memorandum ("TAM") holding that one of the three fees that private aircraft owners pay to NetJets in exchange for *aircraft management services* – the occupied hourly fee – was subject to the section 4261 tax as an "amount paid" for transportation, and that the other two fees – the monthly management and fuel variable surcharge fees – were not subject to the tax.

Although NetJets has always disputed that *any* of its fees are subject to the section 4261 tax, NetJets nonetheless followed the December 1992 TAM for seventeen years by collecting and remitting the tax on its occupied hourly fees.   But then, in 2010, the IRS attempted to retroactively change its position by issuing crippling tax assessments against NetJets, totaling more than $330 million, for failing to collect and remit excise taxes on the monthly management and fuel variable surcharge fees that fractional owners paid to it for the period from October 1, 2003 through June 30, 2009 (the "Assessment Period").

The IRS's retroactive assessments are unlawful, and thus NetJets brought this action to abate them.   In addition, NetJets has filed claims in this action seeking a refund of the section 4261 taxes it collected and remitted on occupied hourly fees during the Assessment Period. NetJets is entitled to summary judgment on its refund and abatement claims for four separate and

independent reasons. For these same reasons, NetJets is entitled to summary judgment in its favor on the Government's counterclaim seeking to enforce the IRS's retroactive assessments.

(1) **NetJets Does Not Sell "Transportation."** Most fundamentally, the section 4261 tax simply does not and never did apply to the payments NetJets receives from the aircraft owners who use its services because it does not sell "transportation" within the meaning of the statute.

Congress has made clear that section 4261 applies to persons who purchase commercial transportation, *i.e.* persons who purchase a flight from a commercial airline or charter operator for a specific trip from one location to another. This Congressional intent is reflected in the text of Section 4261, which expressly describes itself as a "ticket tax." And it is unequivocally reflected in the statute's legislative history, which consistently reinforces that Section 4261 is a tax on "passengers" who purchase "tickets" for "flights" from "commercial carriers."

In contrast to this ticket tax, Congress adopted a separate and alternative excise tax on persons engaged in private aviation, *i.e.*, persons who own their own planes. Instead of imposing the section 4261 "ticket tax," Congress imposed an excise tax under section 4041 of the Internal Revenue Code on each gallon of fuel purchased to operate their private aircraft. Every aircraft owner who used NetJets' services paid this fuel tax during the Assessment Period, but now the IRS wants more.

NetJets has never sold commercial transportation, and thus it cannot be subject to the ticket tax under section 4261. A person cannot pick up the telephone or log onto the internet and purchase a ticket from NetJets to board a plane and be flown from one location to another. Rather, NetJets provides *aircraft maintenance and aviation support services* to private aircraft

2

*owners* that assist these owners in the personal use of their own planes. A person has no need for NetJets' services unless that person owns a whole or fractional interest in an aircraft.

As for persons that do own an interest in an aircraft, they require a number of goods and services to maintain and operate their planes, many of which they lack the time or technical expertise to perform themselves. NetJets assists private aircraft owners by providing these services or by arranging for others to provide them on the owners' behalf. Because the aircraft owners who use NetJets' services are traveling privately on their own planes, they are subject to the fuel tax that applies to private aviation but not the commercial transportation tax under section 4261.

Notably, in 1958, just four years after enactment of the section 4261 ticket tax, the IRS issued a formal ruling that aviation support services identical to those provided by NetJets *do not* constitute the sale of commercial transportation under section 4261; a ruling that is diametrically opposed to the position the IRS asserts here. In Revenue Ruling 58-215, the IRS held that the payments a private aircraft owner makes to an aircraft management company for aircraft maintenance and operational support services are not subject to the section 4261 ticket tax. The IRS correctly concluded that the management company acted as the owner's agent, and thus the management company was not selling transportation to the owner, but rather was assisting the owner in traveling privately on its own plane. That is precisely the relationship between NetJets and the private aircraft owners who use its services. As in Rev. Rul. 58-215, NetJets merely acts as agent to the aircraft owners and provides them with the services they need to use their own private planes.

The statutory text, structure, and legislative history of section 4261, as well as the IRS's own revenue ruling, reflect that the ticket tax is simply inapplicable to the payments private

3

aircraft owners make to NetJets for assistance in personally using their own planes.  As such, NetJets is entitled to summary judgment refunding the section 4261 ticket taxes NetJets paid on the occupied hourly fees and abating the IRS's retroactive assessments against monthly management and fuel variable surcharge fees.

The IRS asserts, however, that NetJets cannot reargue the applicability of section 4261 in this case because the issue was already decided by the Federal Circuit in *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463 (Fed. Cir. 1997), a case involving NetJets' predecessor, Executive Jet Aviation, Inc. ("EJA").  As explained in Part IV.A.5 of this memorandum, *Executive Jet* is no longer good law inasmuch as the Federal Aviation Administration ("FAA") has adopted regulations expressly rejecting the fundamental factual predicates upon which that decision was based.  The *Executive Jet* decision therefore poses no obstacle to NetJets' entitlement to summary judgment in its favor.

**(2)      NetJets' Monthly Management Fee Is Not An "Amount Paid" For Air Transportation Under Section 4261.**  Even assuming, *arguendo*, that the aircraft management services NetJets provides to private aircraft owners could be construed to be commercial air transportation (and they cannot be so construed), NetJets still is entitled to summary judgment abating the ticket taxes the IRS retroactively assessed against the monthly management fees its fractional owners paid during the Assessment Period, because those fees are not amounts paid for taxable *transportation* under section 4261.

Section 4261 taxes only amounts paid for air "transportation."  But here, the monthly management fees paid by fractional owners have nothing to do with transportation, *i.e.* the actual flights that occur on fractionally-owned aircraft.  Rather, the occupied hourly fee covers those flight-related costs.  The monthly management fee, on the other hand, covers costs associated

with *ownership* of an aircraft, *i.e.* the costs a fractional owner must pay to maintain and support her aircraft *even if the aircraft is never flown*.  This is evidenced by the fact that fractional owners must pay the monthly management fee irrespective of whether, or how much, the owner uses the aircraft.   Indeed, although the IRS now attempts to impose the section 4261 ticket tax on payments of monthly management fees, the *Government expressly acknowledged*, in the *Executive Jet* litigation, *that the monthly management fee is not a payment for transportation services*.

Because fractional owners are not paying for transportation when they pay NetJets their monthly management fees, those fees are not taxable under section 4261 as a matter of law. NetJets therefore is entitled to summary judgment abating the IRS's retroactive assessments of the section 4261 ticket tax against NetJets' monthly management fees.

**(3)     The IRS's Retroactive Assessments Are Unlawful Under Established IRS Regulations And Revenue Procedures.**  The IRS's retroactive tax assessments against monthly management and fuel variable surcharge fees during the Assessment Period are also barred by the IRS's own Treasury Regulations and Revenue Procedures.

The IRS issued its December 1992 TAM as part of its examination of the excise tax returns of EJA.[1]  At the time of the examination, EJA charged fractional owners the same three types of fees for its services as NetJets charges today.  Under the December 1992 TAM, the IRS determined that the occupied hourly fees that fractional owners paid to EJA were the only fees subject to the section 4261 ticket tax.  Although the IRS was fully aware that fractional owners also paid monthly management and fuel variable surcharge fees to EJA, the IRS concluded that

---

[1]     "A technical advice memorandum represents an expression of the views of the [IRS] as to the application of law, regulations, and precedents to the facts of a specific case …." 26 C.F.R. s 601.105(b)(5)(viii)(a).

only the occupied hourly fees constituted "amounts paid for air transportation" under section 4261.

EJA disputed that any of its fees were subject to the ticket tax and thus it filed the *Executive Jet* litigation challenging the IRS's position in the December 1992 TAM.  During the lengthy *Executive Jet* litigation, the IRS repeatedly reconfirmed its position that, pursuant to the December 1992 TAM, only the occupied hourly fees (and not the monthly management and fuel variable surcharge fees) were subject to the ticket tax.  The Federal Circuit ultimately agreed, affirming imposition of the ticket tax on the occupied hourly fee, and only the occupied hourly fee.  Thus, the December 1992 TAM is clear: the ticket tax, if it applies at all (and NetJets believes it does not), applies only to NetJets' occupied hourly fees and not its monthly management or fuel variable surcharge fees.

A taxpayer (such as NetJets) that is the subject of a TAM (such as the December 1992 TAM) is entitled to rely on that TAM, and the IRS is *prohibited* from assessing taxes against the taxpayer in a manner that is less favorable than that provided in the TAM.   Under section 601.105 of the Treasury Regulations, 26 C.F.R. § 601.105(b)(5)(viii)(b), a taxpayer loses the protection of a TAM *only if* that TAM is expressly withdrawn, modified or revoked.  Moreover, even when the IRS modifies or revokes a TAM in a manner less favorable to the taxpayer, section 601.105(b)(5)(viii)(b) provides that the IRS's new position "will generally not be applied to the period in which the taxpayer relied on the prior holding in situations involving continuing transactions …."

The Revenue Procedures adopted by the IRS to control its processes reinforce this point: "[i]f an issue addressed in the TAM relates to a continuing action or a series of actions, it is generally applied until it is withdrawn or until the conclusion is modified or revoked by … the

enactment of legislation, the ratification of a tax treaty, a decision of the United States Supreme Court, or the issuance of … regulations, a revenue ruling, or other statement published in the Internal Revenue Bulletin." Rev. Proc. 2014-2, § 13.03 (Jan. 2, 2014).  The Revenue Procedures also provide that "[i]f a new holding in a TAM is less favorable to the taxpayer than the holding in an earlier TAM, the new holding is generally not applied to the period when the taxpayer relied on the earlier holding[,]" unless the "material facts on which the earlier TAM was based have changed." *Id.*  Both Treasury Regulation 601.105 and Revenue Procedure 2 are binding on the IRS as a matter of law.

These binding provisions preclude the efforts of the IRS to now retroactively impose the ticket tax against the monthly management and fuel variable surcharge fees fractional owners paid to NetJets during the Assessment Period.  While NetJets disputes the IRS's December 1992 TAM holding that occupied hourly fees are subject to the ticket tax, NetJets nonetheless was entitled to rely on it, and did so, by collecting and remitting section 4261 taxes on the occupied hourly fees it received from fractional owners, but not on the monthly management or fuel variable surcharge fees they paid.  NetJets' reliance on the December 1992 TAM was entirely appropriate since the IRS never withdrew, modified or revoked it consistent with the requirements enumerated in the Revenue Procedure.  Thus, the IRS's own Treasury Regulations and Revenue Procedures required it to continue to apply the section 4261 tax against EJA and NetJets in the manner set forth in the December 1992 TAM, *i.e.* to continue to apply the tax to *only* the occupied hourly fees.

Federal courts have repeatedly protected taxpayers like NetJets from retroactive tax assessments where the IRS acts in violation of the retroactivity limitations in its own Treasury Regulations and Revenue Procedures.  As the court held in *Lansons, Inc. v. Commissioner*, 622

F.2d 774, 778 (5th Cir. 1980), "the Commissioner's failure to abide strictly by his own regulations limiting retroactive revocation of a favorable ruling amounts to an abuse of discretion." As such, NetJets is entitled to summary judgment on its claims for abatement of the more than $330 million of ticket taxes the IRS has retroactively assessed, contrary to the 1992 TAM, against the monthly management and fuel variable surcharge fees received from fractional owners during the Assessment Period.

**(4)    The IRS's Retroactive Assessments Are Unlawful Under Supreme Court Precedent.**   Finally, the IRS's retroactive assessments of the ticket tax against the monthly management and fuel variable surcharge fees that fractional owners paid to NetJets during the Assessment Period are precluded by the IRS's failure to satisfy its duty to provide clear guidance to NetJets that those fees were subject to the tax.

In *Central Illinois Public Service Co. v. United States*, 435 U.S. 21, 31 (1978), the Supreme Court held that the IRS cannot impose secondary liability against a person for failure to collect taxes unless the IRS has provided "precise and not speculative" guidance to that person of its obligation to collect the tax. The Supreme Court's holding in *Central Illinois* applies to this case because the IRS is attempting to hold NetJets secondarily liable for payment of the ticket tax on monthly management and fuel variable surcharge fees for which NetJets owners are primarily liable – if anyone is. Under sections 4261 and 4291 of the Internal Revenue Code, the person who purchases "taxable transportation" is obligated to pay the ticket tax; the "carrier" who provides the transportation is simply the collector of the tax. However, section 4263 of the Code provides that the "carrier" is secondarily liable to pay the ticket tax in the event the ticket purchaser fails to pay it at the time of purchase.

The IRS has never attempted to assess the ticket tax at issue here against the fractional owners who purchased NetJets' aircraft management services; rather, it seeks to retroactively obligate NetJets to pay it as the secondarily liable party under section 4263 because NetJets failed to collect the tax. But NetJets is not secondarily liable as a matter of law because, under *Central Illinois*, the IRS completely failed to provide NetJets with any guidance, much less "precise" guidance, that monthly management and fuel variable surcharge fees were subject to the ticket tax. To the contrary, the December 1992 TAM itself, as well as the IRS's actions with respect to certain other fractional ownership industry members, provided that NetJets was not obligated to collect the section 4261 ticket tax on its monthly management and fuel variable surcharge fees. The result is hundreds of millions of dollars of retroactive assessments against NetJets for failure to collect excise taxes that the IRS never told NetJets it had an obligation to collect.

This manifest unfairness alone – as recognized by the Supreme Court in *Central Illinois* – requires summary judgment in favor of NetJets on its claims for refund and abatement of the IRS's retroactive assessments against monthly management and fuel variable surcharge fees, as well as the Government's corresponding counterclaim seeking to enforce those assessments.

## II.    Statement Of Facts

### A.    The Plaintiffs In This Case

The plaintiffs in this case are NetJets Aviation, Inc. ("NJA"), NetJets Large Aircraft, Inc. ("NJLA"), NetJets International, Inc. ("NJI"), and Executive Jet Management, Inc. ("EJM"). Each of them is a wholly-owned subsidiary of NetJets, Inc. (which is not a party). [Noe Decl. ¶¶ 4 and 11][2]

---

[2]    The Declaration of William Noe is included as an attachment to this motion.

The plaintiffs operate aircraft management programs that provide aircraft maintenance and aviation support services to individuals and corporations that own fee or leasehold interests in private aircraft.  NJA, NJI and NJLA provide these services to persons who own fractional interests in aircraft, while EJM provides the same services to owners of entire aircraft. [Noe Decl. ¶¶ 4 and 11]   This motion for summary judgment is filed on behalf of NJA, NJI, and NJLA, who are collectively referred to herein as "Plaintiffs" or "NetJets."   EJM is filing a separate motion for summary judgment.

**B.**     **History Of NetJets**

The NetJets fractional ownership program was created in 1986 by the company's then-owner, Richard Santulli. [Noe Decl. ¶ 5]  While the fractional program has always been called "NetJets," the company itself originally was named "Executive Jet, Inc." [Id. ¶ 6]  It had a wholly-owned subsidiary, Executive Jet Aviation, Inc. ("EJA"), which operated the fractional ownership program. [Id.]  In October 2002, Executive Jet, Inc. changed its name to NetJets, Inc. and Executive Jet Aviation, Inc. changed its name NetJets Aviation, Inc. [Id.]

Initially, the NetJets fractional ownership program was operated entirely through EJA/NJA. [Noe Decl. ¶ 7]  After changing its name, however, NetJets, Inc. divided the program among three subsidiaries, with each providing management services for different aircraft types: NJLA provided fractional aircraft management services to owners of the Boeing Business Jet; NJI provided fractional aircraft management services to owners of Gulfstream large cabin aircraft; and NJA continued to provide fractional aircraft management services to owners of all other aircraft types. [Id.]  Although NJA, NJI, and NJLA provided aircraft management services to owners of different types of aircraft, the management services they provided were the same. [Id.]

In 2010, after the tax periods at issue in this case, NetJets' fractional aircraft management services were reconsolidated within NJA for all aircraft types. [Noe Decl. ¶ 8]

C.      **The NetJets Fractional Ownership Program**

The NetJets fractional ownership program does not involve the sale of transportation, by either regularly-scheduled or charter flights, to the aircraft owners who use NetJets' services. [Noe Decl. ¶ 24]  Rather, NetJets provides aircraft maintenance and aviation support services that assist these owners in using their own private planes. [Id.]  A person has no need for NetJets' services unless he or she owns a fractional interest in an aircraft. [Id.]

As with ownership of any large asset, such as a home or an automobile, ownership of an aircraft has a number of ancillary costs. [Noe Decl. ¶ 25]  For example, a person who purchases a fractional interest in an aircraft must pay for storing the aircraft, for maintenance and repair, for fuel, for flight planning and weather services, and for pilots to operate the aircraft. [Id.] Identifying quality vendors who provide these goods and services and then negotiating with them for the best prices requires time and expertise that most private aircraft owners do not possess. [Id.]  Thus, private aircraft owners often hire companies such as NetJets to handle these tasks for them. [Id.]

Aircraft owners that participate in the NetJets fractional ownership program enter into an owners agreement, a management agreement, and a master interchange agreement. [Noe Decl. ¶ 15 and Ex. 1-3]  Under the owners agreement, the owners agree to the terms of use for their jointly owned aircraft. [Id. ¶ 16 and Ex. 1]  They agree to their allotted hours of use, and agree to enter a master interchange agreement (described below) for their purchased aircraft. [Id.]  Each owner also agrees to hire NetJets to provide management services for the aircraft. [Id.]  Since the

owners each own a share of the same aircraft, a single management services company must be selected to manage the aircraft. [Id.]

Under the management agreement, NetJets agrees to perform the tasks and services that an aircraft owner otherwise would have to perform on her own. [Noe Decl. ¶ 17 and Ex. 2] These include (i) arranging aircraft inspection, maintenance and repair services for owners; (ii) maintaining records, logs and other FAA-required materials for owners; (iii) obtaining aircraft fuel for owners; (iv) arranging flights (*i.e.* scheduling with airports, arranging flight plans, etc.) per owners' instructions; (v) providing pilots and crew for owners; and (vi) receiving legal notices from the FAA as agent for the owners. [Id.]

In exchange for these management services, the aircraft owner agrees to pay three different fees under the management agreement:

- *Occupied Hourly Fee*:  A per flight hour fee to cover the costs associated with operating the aircraft, such as fuel, oil, lubricants, aircraft maintenance and repairs, flight planning, landing fees, and weather and communications services. This fee is also sometimes referred to as the "occupied hourly rate charge." [Noe Decl. ¶ 17]

- *Monthly Management Fee*: A fixed charge that covers costs associated with ownership of the aircraft, such as insurance, crew salaries, crew training, aircraft hangaring, and scheduling costs, which an owner must pay regardless of whether, and how much, she uses her aircraft.  Even if the airplane never leaves the ground, the owner pays the monthly management fee. [Noe Decl. ¶ 17]

- *Fuel Variable Surcharge*: An adjustment recognizing the fluctuation in the market price of aviation fuel.  An owner pays this fee when aviation fuel prices rise above the agreed upon price in the owner's management agreement. [Noe Decl. ¶ 17]

In addition to the owners agreement and management agreement, fractional aircraft owners who use NetJets' management services also enter into a master interchange or "dry lease" agreement. [Noe Decl. ¶ 19 and Ex. 3]  A "dry lease" is the lease of an aircraft without crew. [Id.]  Under the master interchange agreement, the fractional owners agree to dry lease their respective aircraft to one another as needed. [Id.]  This avoids potential scheduling conflicts that might arise from multiple fractional owners wanting to use their aircraft at the same time, because it assures a fractional owner whose aircraft is unavailable at a desired time the right to use another fractionally-owned aircraft. [Id.]

Because the fractional owners agree to dry lease their aircraft to one another, a fractional owner is always traveling on an aircraft in which she has a present ownership interest, either a title interest if it is her own aircraft or a leasehold interest if it is the aircraft of other fractional owners under the dry-lease agreement. [Noe Decl. ¶ 20]

### D.  The Fractional Owners Who Use NetJets' Management Services Are *Bona Fide* Owners Of Their Aircraft

The fractional aircraft owners who use NetJets' aircraft management and support services are *bona fide* owners of their aircraft. [Noe Decl. ¶ 31]  They pay substantial amounts to acquire their ownership interests, ranging anywhere from two hundred thousand dollars for a minimum one-sixteenth fractional interest to as much as fifty million dollars for an entire aircraft. [Id.]  These owners do not purchase their aircraft from Plaintiffs, because Plaintiffs do not sell aircraft. [Id. ¶¶ 10 and 12]  Plaintiffs provide only the aircraft maintenance and support services

13

described above. [Id.]  The owners purchase their fractional interests from separate legal entities which are not parties to any of the assessments at issue here. [Id.]

The fractional owners take legal title under a bill of sale; are listed as title owners of their aircraft on the ownership registry of the Federal Aviation Administration ("FAA"); may borrow against their ownership interest by using it as collateral; may sell their ownership interest on the open market; and are entitled to depreciate their ownership interest on their federal tax returns if they use the aircraft for business purposes. [Noe Decl. ¶ 31]  And, as owners, they assume the risk that the value of their investment in the aircraft may depreciate. [Id. ¶ 32]  In the recent economic downturn, for example, the substantial decline in demand for ownership of private aircraft cost owners dearly.  Owners who sold during the downturn lost hundreds of thousands of dollars even if they had owned their aircraft for just a brief time. [Id.]  As but one example, an owner who bought an interest in a Hawker 800XP aircraft in July 2007 for $1,225,000 sold it two years later for $476,542. [Id.]

In contrast, a passenger who purchases air transportation from a commercial airline or charter operator has no ownership interest in, and therefore bears no risk of economic loss relating to, the aircraft on which she flies. [Noe Decl. ¶ 33]  Rather, the purchase price of her ticket simply provides the passenger with a temporary license to enter upon the airline company's aircraft for a specific flight (or series of flights) from one location to another. [Id.] Once the flight ends, the passenger has no further right to use or occupy the aircraft. If the passenger wants to travel somewhere else, she has to buy another ticket. [Id.]  This is in sharp contrast to the aircraft owners who use NetJets' aircraft management and support services. Those owners do not need to purchase ticketed air transportation from others because, as aircraft owners, they have the means of transporting themselves. [Id.]

### E.  NetJets Acts As Agent For The Aircraft Owners

Each private owner's management agreement expressly states that NetJets is to perform its aircraft management functions on behalf and at the direction of the aircraft owner. [Noe Decl. ¶ 26 and Ex. 1]  The aircraft owner controls where she flies, when she flies, and with whom she flies. [Id.]  Each owner sets the itinerary and timing of her travel, and picks both the airport of departure and destination based solely on her own convenience. [Id.]  An owner's control is so great that, even after the plane has taken off, the owner may reroute the flight to a different destination. [Id.]  Her control also extends to the amenities available within the cabin: she picks the food to be served, the music to be played, and the types of beverages offered on the flight. [Id. ¶ 27]  An aircraft owner may even pilot her own plane provided she is appropriately qualified and licensed. [Id. ¶ 28]  NetJets' role is to make sure the owner's aircraft is properly maintained and to provide the support services the owner needs to travel safely where she wants, when she wants, on her own private aircraft. [Id. ¶ 29]

### F.  The IRS's 1992 Technical Advice Memorandum

In 1992, while the company was still operating as EJA, the IRS initiated an examination of EJA's quarterly excise tax returns. [Strapp Decl. ¶ 13][3]  At that time, EJA operated both an aircraft charter business and the fractional management business described above. [Id. ¶¶ 10-11]  With respect to the charter business, EJA collected and remitted the section 4261 ticket tax that applies to commercial aviation. [Id.]  EJA did not collect and remit the section 4261 tax on payments it received in its fractional management business, however, because EJA believed that the aircraft owners who used those services were engaged in private, not commercial, aviation. [Id.]  Instead, the fractional owners who participated in EJA's aircraft management program paid the separate section 4041 excise tax on fuel purchases that applies to private aviation. [Id.]

---

[3]  The Declaration of Gary P. Strapp is included as an attachment to this motion.

EJA's fractional program in 1992 was materially the same as the NetJets program during the Assessment Period. [Strapp Decl. ¶ 9] Aircraft owners who participated in EJA's fractional program signed the same operative agreements described above. [Id.] They also paid EJA an occupied hourly fee, a monthly management fee, and a fuel variable surcharge fee, just as fractional owners paid during the Assessment Period. [Id.]

Initially, the IRS's 1992 examination involved only the excise tax returns relating to EJA's charter business. [Strapp Decl. ¶ 13] However, the IRS subsequently expanded its examination to include EJA's fractional aircraft management program. [Id. ¶ 5] As part of the examination, the IRS revenue agent conducting the examination, Mr. James Marn, reviewed copies of the operative documents relating to EJA's fractional management program. [Id. ¶ 16] These included the owners agreement, management agreement, and dry-lease agreement. [Id.] These agreements, particularly the management agreement, plainly showed that fractional owners agreed to pay EJA an occupied hourly fee, a monthly management fee, and a fuel variable surcharge fee. [Id.]

The revenue agent also reviewed owner invoices as part of the 1992 examination. [Strapp Decl. ¶ 17] At that time, just like today, EJA issued two types of invoices to fractional owners each month: an invoice for the owner's monthly management fee and a separate invoice for its occupied hourly fee and fuel variable surcharge fee relating to the owner's use of aircraft that particular month. [Id.] The occupied hourly fee and fuel variable surcharge fee were separately identified and stated on different lines of the second invoice. [Id.] Thus, the revenue agent could plainly see the three different fees based on his review of monthly invoices. [Id.]

The IRS revenue agent concluded that the occupied hourly fee and monthly management fee paid by fractional owners to EJA should be subject to section 4261's commercial-

transportation tax. [Strapp Decl. ¶ 18]  EJA disputed the revenue agent's conclusion. [Id.]  As set forth above, EJA believed it did not provide fractional owners with commercial transportation under section 4261 and therefore none of the payments it received from fractional owners was subject to the ticket tax. [Id.]

Given this dispute, the revenue agent submitted a "request for technical advice" (a "TAM") to the IRS Office of Chief Counsel (the "National Office"). [Strapp Decl. ¶ 19]  In his request for technical advice, the revenue agent conducting the EJA examination stated the issue as follows:

> Are amounts paid for "hourly fee" or "management fee" by customers of Executive Jet Aviation, Inc. participating in the "NetJets" program subject to the federal excise tax on transportation of persons by air imposed under the Internal Revenue Code Section 4261?
>
> [Strapp Decl. ¶ 19 and Ex. 4]

On December 22, 1992, the IRS's National Office issued a technical advice memorandum in response to the revenue agent's request (the "December 1992 TAM"). [Strapp Decl. ¶ 20 and Ex. 5]  The IRS concluded that EJA was providing taxable transportation to fractional owners under section 4261 of the Code. [Id.]  The IRS specifically referenced the occupied hourly fee and monthly management fee in its December 1992 TAM, but it did not identify which of EJA's fees was subject to the section 4261 tax. [Id.]  Instead, the IRS stated that "[t]he tax imposed by section 4261(a) of the Code should be collected by the taxpayer on amounts paid to it by aircraft owners for air transportation provided by the taxpayer …." [Id.]

Given this conclusion, EJA had discussions with the IRS following the issuance of the December 1992 TAM regarding which of EJA's fees constituted "amounts paid to it by aircraft owners for air transportation." [Strapp Decl. ¶ 21]  These discussions are reflected in a letter,

dated February 5, 1993, from EJA's counsel to the IRS revenue agent. [Id. ¶ 22 and Ex. 6]  In

that letter, EJA's counsel stated:

> In accordance with Gary Strapp's conversations with you today and earlier this week, I am setting forth below matters that I, acting on behalf of Executive Jet Aviation, Inc., believe should be discussed … :
>
> *   *   *
>
> (2)  The views of EJA and the District Office [of the IRS] concerning what is the "amount paid" if the Technical Advice Memorandum in not withdrawn.  Specific issues include whether the occupied hourly rate is the appropriate amount, whether the management fee which is paid for management services without regard to use has any relevance at all, and whether and how the National Office's position with respect to the value of the use of the aircraft can be implemented….
>
> [Strapp Decl. ¶ 22 and Ex. 6]

On March 9, 1993, EJA's Controller, Gary Strapp, sent a letter to the IRS revenue agent

proposing that only the occupied hourly fee, which was $1,060 per hour in 1993, should be

treated as an "amount paid for air transportation" under the December 1992 TAM, because that

charge reflected the value of a particular flight. [Strapp Decl. ¶ 23 and Ex. 7]  To support this

proposal, Mr. Strapp provided the IRS with information showing that the amount of the occupied

hourly fee was comparable to the rates being charged by charter companies for individual flights.

[Id.]  The IRS's National Office accepted Executive Jet's proposal and agreed that only the

occupied hourly rate charge would constitute an "amount paid for air transportation" under the

December 1992 TAM. [Id.]

After reaching agreement on the meaning and application of the December 1992 TAM,

EJA began collecting and remitting the section 4261 tax on its occupied hourly fees in the second

quarter of 1993. [Strapp Decl. ¶ 24]  EJA modified the form of its monthly invoices to

specifically reflect that the excise tax was being imposed on the occupied hourly rate charge

only, in accordance with the December 1992 TAM. [Id. ¶ 25 and Ex. 8]  Mr. Strapp provided the IRS revenue agent with copies of the new form of invoice so that he could see the manner in which EJA was collecting and remitting the section 4261 tax based on the December 1992 TAM. [Id.]

### G. The IRS Denies EJA's Administrative Claims For Refund Of Section 4261 Taxes But Acknowledges That EJA's Collection Of The Tax On Occupied Hourly Fees Only Is "Correct" Under Section 4261

 After collecting and remitting the section 4261 tax on occupied hourly fees for the second and third quarters of 1993, EJA submitted its quarterly excise tax returns showing the amount of tax paid. [Strapp Decl. ¶ 26 and Ex. 9]  EJA's returns showed section 4261 taxes of $346,405 and $486,154 for the second and third quarters of 1993 respectively. [Id.]

Because EJA still believed that its fractional ownership program involved private aviation, not commercial transportation, EJA filed administrative claims for refund of the tax it had collected and remitted in the second and third quarters of 1993 on occupied hourly fees paid by Texaco Air Services, Inc., one of the fractional owners participating in EJA's management program. [Strapp Decl. ¶ 27 and Ex. 10]  The IRS reviewed EJA's refund claim, and, on April 26, 1994, notified EJA that it had disallowed EJA's refund claims. [Id. ¶ 28]  At the same time it denied EJA's refund claim, the IRS also provided EJA with an agency form – "Form 5385" – indicating that EJA had correctly collected and remitted the section 4261 tax. [Id. ¶ 28, Ex. 11]

The IRS's Revenue Procedures expressly provide that "[a]fter a TAM is issued, the field office must process the taxpayer's case on the basis of the conclusions in the TAM." Rev. Proc. 2014-2 § 12.01, 2014 WL 16118 (Jan. 2, 2014).  Therefore, if the IRS believed the December 1992 TAM required EJA to collect and remit section 4261 taxes on monthly management and/or fuel variable surcharge fees in addition to occupied hourly fees, the IRS was obligated to indicate

on its Form 5385 that there was a deficiency regarding the amount of section 4261 taxes reflected on EJA's quarterly returns.  But the IRS did not indicate any deficiency relating to EJA's monthly management and fuel variable surcharge fees because, as set forth above, the December 1992 TAM required collection and remittance of the section 4261 tax on EJA's occupied hourly fee only.  In fact, the IRS expressly stated on its Form 5385 that the $346,405 and $486,154 remitted by Executive Jet based solely on the occupied hourly fees it received, was the "correct liability" under section 4261. [Strapp Decl. ¶ 28 and Ex. 11]

## H.    EJA Files Suit Challenging The IRS's Application Of The Section 4261 Tax

After the IRS denied EJA's administrative claims, EJA filed a tax refund action in the United States Court of Federal Claims. [Strapp Decl. ¶ 29]  That case was styled as Executive Jet Aviation, Inc. v. United States, Case No. 95-7T ("*Executive Jet*"). [Id.]

During *Executive Jet*, the United States repeatedly acknowledged the IRS's position that, under the December 1992 TAM, the section 4261 tax applied only to occupied hourly fees. [Id.] For example, in its cross motion for summary judgment, the United States stated:

> **EJA proposed on the basis of data EJA submitted to the IRS concerning comparable charter rates, that the Hourly Rate of $1,060 be used to compute the 10% F.E.T. ($106 per Hour) which would be computed on the number of hours actually flown per month by each NetJets owner.  That hourly rate was accepted by the Internal Revenue Service as the rate upon which the F.E.T. would be calculated.**

[Strapp Decl. ¶ 30 and Ex. 12 at pg. 10 (emphasis added)]

The United States again acknowledged the IRS's position that, under the December 1992 TAM the section 4261 tax applied only to occupied hourly fees, in a Joint Report that it submitted to the court in *Executive Jet* after oral argument on the cross motions for summary judgment:

20

> **For the purpose of <u>determining</u> the amount of the air transportation tax to which EJA was <u>required</u> by the Internal Revenue Service ("IRS") <u>to charge</u> for flights by owners and lessees of aircraft participating in the interchange under the Master Interchange Agreement, EJA and the IRS <u>agreed</u> in March 1993 that the hourly rate of $1,060 then payable under the Management Agreement could appropriately be used because it was within the range of commercial charter rates** ....

[Strapp Decl. ¶ 31 and Ex. 13 at ¶ 1, pg. 1 (emphasis added)]

On March 29, 1996, the Court of Claims in *Executive Jet* issued a summary judgment decision in favor of the United States and against EJA, holding that the occupied hourly fees that Texaco Air paid to EJA were subject to the section 4261 tax on air transportation. The court specifically questioned whether Texaco Air's other payments to EJA should be subject to the section 4261 tax, but declined to address the question because of the IRS's agreed position that only the occupied hourly fee was subject to the tax. In fact, the court concluded that the IRS's position reflected its current stipulation as to the proper measure of the tax:

> **The IRS <u>agreed</u> to base the tax on the hourly rate** of only $1,060 on the basis of data submitted by EJA regarding comparable charter rates and apparently did not take into account the monthly management fee, or the value of the use of the planes by EJA. (It is unclear, however, why the IRS did not treat any part of the management fee, or the value of the airplanes provided for EJA's use or non-NetJets flights, as an amount paid for taxable transportation and thus subject for the § 4261 tax. **Whether this stipulation is as to the historical agreement only, or whether it represents the government's current stipulation as to the proper measure of the tax is also unclear. Since no offset has been pleaded, the court assumes the latter is the case.**)

[Strapp Decl. Ex. 14 at pgs. 5-6 (emphasis added)] [4]

EJA appealed the Court of Claims' decision to the Federal Circuit Court of Appeals. The

---

[4] The court's reference to there being "no offset" was a reference to the fact that the Government did not file a counterclaim in *Executive Jet* to collect unpaid ticket taxes on monthly management or fuel variable surcharge fees. Under IRS procedures, the Government would have asserted a counterclaim if the December 1992 TAM had required collection and remittance of section 4261 taxes on those fees as well. [See Kutten Decl. ¶¶ 33-35 (attached)]

United States, in its appellate brief, again acknowledged the IRS's position that, under the December 1992 TAM, only the occupied hourly fee was subject to the section 4261 transportation tax. [Strapp Decl. ¶ 33]  The United States expressly stated that any suggestion by the Court of Claims below "that all of Texaco Air's payments to EJA should serve as the basis for the transportation tax has no legal significance … because the Commissioner levied a tax **only on the occupied hourly rate charge of $1,060 per hour**." [Strapp Decl. Ex. 15 at pg. 21 n. 14 (emphasis added)]

The Federal Circuit affirmed the judgment of the Court of Claims. *See Executive Jet Aviation v. United States*, 125 F.3d 1463 (Fed. Cir. 1997).  In its decision, the Federal Circuit expressly noted that the IRS had computed the tax that was due under section 4261 based on the occupied hourly fee only:

> **The IRS computed the tax that was due for Texaco Air's flights based upon the hourly rate of $1060 that EJA charged Texaco Air for each hour of flight time.   No transportation tax was assessed with respect to the monthly fee that Texaco Air paid whether or not it utilized interchange aircraft.**
>
> [*Id.* at 1467]

**I.      The Federal Aviation Administration Promulgates Regulations That Treat And Regulate Fractional Management Programs As Private Aviation**

The court's decision in *Executive Jet* was based on the court's conclusion that fractional ownership was not a *bona fide* form of private aircraft ownership. 125 F.3d at 1469.  Looking to what it thought was the "substance rather than the form," the court held that there were "negligible differences" between EJA's fractional ownership program and "the operation of a commercial charter business." *Id.*  The court thus concluded that EJA was providing commercial air transportation, *i.e.* transportation "for compensation or hire…." *Id.*

At the time of the *Executive Jet* decision, fractional ownership programs were still a fledgling industry. The Federal Aviation Administration ("FAA") had not yet even issued formal regulations governing their operations. That changed in 2003, six years after *Executive Jet*.

In 2003, the FAA promulgated a comprehensive set of Federal Aviation Regulations ("FARs") explicitly regulating the fractional ownership industry. *See* 14 C.F.R. §§ 91.1001-91.1443. These regulations were the product of an in-depth study of the fractional ownership industry by an FAA-appointed committee of representatives from both the public and private sectors. [Arber Decl. ¶¶ 6-11][5] Contrary to the court's conclusion in *Executive Jet*, the FAA adopted this committee's conclusion that fractional aircraft owners are not engaged in charter transportation, but rather they are *bona fide* owners engaged in the private use of their own aircraft. The preamble to the FARs expressly draws the factual distinctions between charter flights and fractional ownership that the court in *Executive Jet* had failed to appreciate:

> [F]ractional owners flying aboard fractionally-owned aircraft contractually acknowledge substantial control over and bear substantial responsibility for the airworthiness and operation of their aircraft. Like whole aircraft owners, fractional owners can initiate, conduct, redirect and terminate a flight.… Additionally, … both fractional owners and whole aircraft owners have other shared characteristics that relate at least in part to safety: (1) They conduct research so that they can be assured that they will select the right aircraft and realize an adequate return from their capital investment; (2) they possess an interest in an aircraft acquired through a significant capital investment; (3) they purchase aviation expertise for the purpose of managing, maintaining or otherwise aiding the operation of the aircraft they operate under part 91, including the option to select flight crews; and (4) they bear the risk of loss or damage to the aircraft and the risk of diminution of value of the aircraft. **On-demand charter passengers, on the other hand, do not assume any of these risks and responsibilities nor do they have any significant financial**

---

[5] Gary Arber was a member of this FAA-appointed committee. Mr. Arber has submitted a declaration, which is included as an attachment to this motion.

> investment in the chartered aircraft. . . .
>
> [F]ractional owners flying aboard fractionally-owned and operated aircraft share more of their regulatory characteristics with the owners of non-commercially operated aircraft than with passengers using on-demand [charter] operators….
>
> [66 Fed. Reg. 37520, 37522 (2001)]

The FARs go on to define fractional ownership in order to ensure that fractional ownership arrangements are extended only to *bona fide* owners, and that commercial charter services will not qualify. *See* Preamble to FARs, 66 Fed. Reg. 37520, 37525 (2001).  For example, to qualify as a "fractional owner," a person must own at least a one-sixteenth interest in an aircraft. 14 C.F.R. § 91.1001(b)(10).  As set forth above, an interest of this size costs $200,000 or more.  By requiring such a significant capital expenditure, the FAA eliminated "potential abuse by persons who try to offer air charter transportation under the guise of a fractional ownership program." Preamble to FARs, 66 Fed. Reg. 37520, 37525 (2001).

The FARs also mandate the elements that are required for a fractional ownership program to qualify as a valid and substantive management program as opposed to a charter operation. The FAA requires that the program must (i) be managed by a "single fractional ownership program manager on behalf of the fractional owners[,]" with the program manager "designated ... as the owner's agent"; (ii) include a "dry-lease aircraft exchange arrangement among all of the fractional owners"; and (iii) include "[m]ulti-year program agreements covering the fractional ownership, fractional ownership program management services, and dry-lease aircraft exchange aspects of the program." 14 C.F.R. § 91.1001(b)(5) and 91.1003(c).

Importantly, *the FARs expressly preclude use of fractional program aircraft to provide commercial transportation*: *"no owner may carry persons or property for compensation or hire on a program flight."* 14 C.F.R. § 91.1005(a) (emphasis added).  "Commercial aviation" is

defined in the Internal Revenue Code as the "use of an aircraft in a business of transporting persons or property for compensation or hire by air." 26 U.S.C. § 4083(b). The FARs, *having the effect of federal law*, expressly prohibit fractional ownership programs from engaging in commercial aviation. Thus, contrary to the holding in *Executive Jet* that fractional ownership programs were the equivalent of charter transportation, the FARs absolutely preclude fractional program aircraft from ever conducting charter flights. The FAA's adoption of the FARs decimated the factual basis of the *Executive Jet* decision.

Each of the NetJets entities has fully complied with the requirements of the FARs. [Noe Decl. ¶ 21] [Arber Decl. ¶ 18] As such, the FAA certified each as a lawfully recognized "fractional ownership program manager" providing "management services" to fractional owners under the FARs. *See* 14 C.F.R. § 91.1001(b)(8)-(b)(9), § 91.1002, and § 91.1014.

**J.      The IRS Retroactively Assesses Section 4261 Taxes Against NetJets' Monthly Management And Fuel Variable Surcharge Fees**

After the *Executive Jet* decision, NetJets continued to rely on the IRS's December 1992 TAM by collecting the section 4261 tax on *only* its occupied hourly fee and none of its other fees. [Strapp Decl. ¶ 35] [Garvey Decl. ¶ 20][6] NetJets collected in this manner quarter after quarter, year after year, during all of the tax periods at issue in this case. [Id.]

In June 2007, the IRS initiated an examination of the excise tax return of NJA for the period from January 1, 2006 through March 31, 2006. [Garvey Decl. ¶ 10] Over the course of the next three years, however, the IRS repeatedly expanded the scope of its examination until ultimately it included NJA, NJI, and NJLA, and covered tax periods spanning from October 1, 2003 through June 30, 2009. [Id.]

---

[6]      The Declaration of Jonina R. Garvey is included as an attachment to this motion.

On January 29, 2010, the IRS notified NetJets that the IRS had retroactively assessed the ticket tax against monthly management fees and fuel variable surcharge fees for the tax periods between January 1, 2005 and June 30, 2009 for NJA; between October 1, 2003 and June 30, 2009 for NJLA; and between April 1, 2005 and June 30, 2009 for NJI. [Garvey Decl. ¶ 15] Those assessments totaled $339,697,080. [Id.] Moreover, because the assessments were retroactive, the IRS also assessed, and is continuing to assess, penalties and interest on each of them. [Id. ¶16] As of September 2012, the total amount of the penalties and interest accrued on the foregoing assessments totaled approximately $135,423,944, thus bringing the total amount of the assessments to more than $475 million. [Id.]

### K. Congress Clarifies And Reaffirms That, Under Existing Law, The IRS's Position Is Wrong – Fractional Aircraft Ownership Programs Are Not Subject To The Ticket Tax

In 2012, Congress took it upon itself to amend section 4261 for the purpose of clarifying that, contrary to the position of the IRS, the ticket tax does not apply to fractional aircraft ownership programs. *See* Pub. L. No. 112-95, 126 Stat. 11 (Feb. 14, 2012), *codified as amended* at 26 U.S.C. §§ 4041 and 4261. Congress made clear that this amendment was necessary because of the IRS's incorrect application of the ticket tax to fractional programs. For example, the Senate Finance Committee made the following statement in a 2011 report:

> **The Committee notes that the IRS and FAA classify flights on aircraft that are part of a fractional ownership program differently. Under the FAA safety regulations, such flights are considered general aviation, while the IRS classifies such flights as commercial aviation for tax purposes. The Committee wishes to make clear that fractional flights should be considered as noncommercial aviation for tax purposes.**

> [S. Rep. 112-1, 2011 WL 520955, at *9 (emphasis added)]

And again in 2012, Congress expressed that the statutory amendment was intended *clarify and reaffirm* the existing law that fractional aircraft owners who travel privately on their own planes are subject to the separate "fuel tax" on noncommercial aircraft, not the ticket tax in section 4261:

> **The Federal Aviation Administration recognized that fractional [aviation] is noncommercial in 2003, but the Internal Revenue Service is still trying to tax it the same as a commercial airline ticket, despite the fact that fractional owners own their planes. Today we are** <u>**clarifying**</u> **and** <u>**reaffirming**</u> **that fractional aviation is** <u>**non-commercial**</u> **aviation. This bill clearly states that instead of being subject to the commercial ticket tax [imposed by § 4261], as the IRS has asserted, fractional flights will pay the** <u>**fuel tax**</u> **used in noncommercial aviation, plus a fractional surtax.**

> [158 Cong. Rec. H445-04, H456 (emphasis added)]

Congress passed the foregoing amendment in 2012. As a result, fractional aircraft ownership programs are now specifically identified in the statute as being exempt from section 4261.

**L.    The IRS Treats Other Fractional Ownership Program Managers More Favorably Than It Is Treating NetJets**

On at least two occasions, the IRS has given more favorable tax treatment under section 4261 to NetJets' competitors in the fractional aircraft ownership industry. The first occurred in 2006, when the IRS *rescinded* retroactive ticket tax assessments it had imposed against the monthly management fees that Bombardier Aerospace Corporation ("Bombardier") received from fractional owners for the period from April 1, 1998 through December 31, 2005, and also *refunded* to Bombardier ticket taxes it had collected and remitted on monthly management fees for periods prior to the *Executive Jet* case. [Garvey Decl. ¶¶ 5-8]

The second occasion happened in 2013, when the IRS *rescinded* its retroactive ticket tax assessments against the monthly management and fuel variable surcharge fees of PlaneSense, Inc. (formerly Alpha Flying, Inc.), another fractional aircraft management company.  The IRS's rescission of its assessments with respect to PlaneSense covered the period from April 1, 2004 through December 31, 2011. [Arber Decl. ¶¶ 19-23]

Despite the IRS's favorable ticket tax treatment of these other fractional ownership program managers, the IRS refuses to rescind its retroactive assessments against NetJets with respect to these same types of fees for largely the same tax periods.

## III.    The Claims And Counterclaims At Issue In This Case

This case involves claims and counterclaims regarding the IRS's imposition of section 4261 taxes against the occupied hourly fees, monthly management fees, and fuel variable surcharge fees that fractional owners pay to Plaintiffs for aircraft management services.

Throughout the tax periods at issue in this case, Plaintiffs collected and remitted the section 4261 tax on occupied hourly fees its owners paid, and only occupied hourly fees, in reliance on the IRS's December 1992 TAM.  Inasmuch as NetJets only provides aircraft maintenance and support services, and not "transportation," it has filed claims in this case for refund of those taxes, plus interest.

Plaintiffs also have filed claims for refund and abatement of the section 4261 taxes the IRS retroactively assessed against Plaintiffs' monthly management and fuel variable surcharge fees in 2010.  Plaintiffs did not collect and remit any section 4261 taxes on these fees in reliance on the December 1992 TAM.  After the IRS issued its assessments, however, Plaintiffs paid a divisible portion of them as was required for Plaintiffs to have standing to bring this action. Plaintiffs have asserted claims for refund of the divisible portions paid on the IRS's retroactive

assessments against monthly management and fuel variable surcharge fees, and also have asserted claims for abatement of the unpaid portions of those assessments.

Plaintiffs' claims for refund of the taxes remitted on occupied hourly fees and the divisible portions paid on the assessments against monthly management and fuel variable surcharge fees total $219,540,056, plus interest. [*See* attached Schedules A and B]  Plaintiffs' claims for abatement of the unpaid portions of the assessments against monthly management and fuel variable surcharge fees total $339,697,080, plus accrued interest and penalties. [*See* attached Schedule B]  The IRS has asserted a counterclaim seeking to collect the unpaid portions of the IRS's assessments against monthly management and fuel variable surcharge fees.

For the reasons explained below, Plaintiffs are entitled to summary judgment in their favor on both their refund and abatement claims and on the Government's counterclaim.

## IV.   Law And Argument

### A.   NetJets Does Not Provide "Taxable Transportation" Under Section 4261

#### 1.   The Relevant Statutory Text And Structure Make Clear That The Ticket Tax Applies Only To The Sale Of Commercial Flights, Not Management Services Supporting Private Aircraft Usage

Section 4261 of the Internal Revenue Code provides as follows: "There is hereby imposed *on the amount paid for taxable transportation of any person* a tax equal to 7.5 percent of the amount so paid." 26 U.S.C. § 4261 (emphasis added).  "Taxable transportation" is defined by section 4262 of the Code as "transportation by air which begins in the United States or in the 225-mile zone and ends in the United States or in the 225-mile zone." 26 U.S.C. § 4262(a).

While the definition of "taxable transportation" in sections 4261 and 4262 does little to clarify the meaning of the term, other language in the statute makes clear that Congress intended "taxable transportation" to mean the sale of commercial flights.  In two separate places within

section 4261, Congress expressly describes the statute as a "ticket tax." *See* 26 U.S.C. § 4261(e)(1)(C) ("No phase in of reduced *ticket tax*") and § 4261(e)(5) ("Rates of *ticket tax* for transportation beginning before October 1, 1999") (emphasis added). Likewise, section 4262 expressly refers to "ticket" purchases in addressing taxable transportation. *See* 26 U.S.C. § 4262(c)(3)(B) ("the scheduled interval in subparagraph (A) shall be deemed to be not more than 12 hours if a *ticket* for the subsequent portion of such transportation is purchased within 12 hours") (emphasis added).

Other statutes in the Internal Revenue Code also describe section 4261 as a tax that applies to "tickets." For example, section 7275(a) of the Internal Revenue Code states that "*the ticket*" for taxable transportation under section 4261 must show the total of "the amount paid for such transportation" and "the taxes imposed by subsections (a) and (b) of section 4261." Another example is section 6302 of the Internal Revenue Code, which describes section 4261 as a tax on "*airline tickets*." *See* 26 U.S.C. § 6302(e) ("Time for deposit of taxes on … airline tickets").

Congress' repeated description of section 4261 as a tax on *tickets* makes clear that the statute is intended to apply only to the sale of commercial air transportation, not to the expenses that a private aircraft owner pays to maintain and operate her aircraft. Whereas commercial air transportation is obtained by the purchase of a ticket for a seat on the carrier's airplane, private aircraft owners transport themselves on their own airplanes, and thus they have no need to buy a ticket for a flight. Nothing in section 4261 remotely suggests these private aircraft owners must pay a ticket tax when they purchase aviation support services to assist them in using their own airplanes.

This does not mean that private aircraft owners are exempt from aviation use taxes. Rather, Congress enacted a tax entirely separate from the ticket tax that private aircraft owners are required to pay.  Section 4041(c) of the Internal Revenue Code imposes a tax of 21.8 cents per gallon on aviation fuel sold to any "owner, lessee, or other operator of an aircraft" for private air travel.  Persons who use their airplanes for "commercial aviation" are not subject to this 21.8 cent per gallon tax; instead, they pay a significantly lower fuel tax of only 4.3 cents per gallon. *Id.*  But, of course, NetJets fractional owners are precluded by the FARs from using their planes for "commercial aviation," which the Internal Revenue Code defines as "any use of an aircraft in a business of transporting persons or property for compensation or hire by air …." 26 U.S.C. § 4083(b).

### 2. The Legislative History Confirms That The Ticket Tax Was Intended To Apply Only To The Sale Of Commercial Transportation And Not To The Costs Of Support Services Purchased By Private Aircraft Owners

Congress' intent for section 4261 to apply only to the sale of commercial flights is reinforced by a review of the legislative history.  Congress has repeatedly stated that the ticket tax in section 4261 applies to "commercial transportation" (which is expressly prohibited under the FARs that apply to NetJets owners), whereas the fuel tax applies to "general" or "private" aviation.

For example, in enacting an amendment to the federal excise-tax statutes in 1969, Congress stated that personal use of aircraft by their owners is "noncommercial aviation" that is subject to the fuel tax and not the ticket tax:

> **[A]ny personal use of an aircraft by the owner, lessee, or other operator of an aircraft is use of the aircraft in noncommercial aviation. . . .**

> [H.R. Rep. 91-601, 1970 U.S.C.C.A.N. 3047, 3092 (emphasis added)]

The 1969 report goes on to sharply draw the line between "commercial carriers," which must collect the ticket tax, and noncommercial aviation by private airplane owners, which is subject to the separate fuel tax imposed by section 4041 of the Code:

**PASSENGER AND FREIGHT TICKET TAXES**

The Ways and Means Committee's action, insofar as commercial carriers are concerned, obtains most of the additional tax revenue from passenger … taxes by increasing the present 5-percent **passenger ticket tax** to 8 percent and by imposing a new $3 'head' tax on passenger tickets for international flights ….

**FUEL TAXES**

While the bulk of the user revenues from commercial carriers are to be derived from taxes on passengers and freight, **most of the <u>user</u> <u>revenues</u> <u>from</u> <u>general</u> <u>aviation</u> (i.e., <u>noncommercial</u> <u>aviation</u>, or any use of an aircraft other than in a business of 'transporting persons or property for compensation or hire by air') will be obtained from taxes on <u>fuel</u> used in aviation** ….

[H.R. Rep. 91-601, 1970 U.S.C.C.A.N. 3047, 3084 (emphasis added)]

In 1997, Congress reaffirmed this dichotomy between commercial transportation, which is subject to the "ticket tax," and private aircraft usage, which is subject to the fuel tax:

**Commercial air passenger transportation taxes**

Domestic air passenger transportation is subject to an ad valorem excise tax equal to 10 percent [now 7.5 percent] of the amount paid for the transportation…. **The air passenger transportation excise taxes are imposed on <u>passengers</u>; transportation providers (generally <u>airlines</u>) are responsible for collecting and remitting the taxes to the Federal Government…. The amount of air passenger transportation excise tax collected from a <u>passenger</u> must be stated separately on the <u>ticket</u>.**

\*   \*   \*

**Noncommercial aviation**

32

> Noncommercial aviation, or **transportation on private aircraft which is not "for hire," is subject to excise taxes imposed on fuel in lieu of the commercial air passenger ticket … excise taxes**.

> [H.R. Rep. 105-148, 1997 U.S.C.C.A.N. 874-75 (emphasis added)]

In the same report, Congress again declared that section 4261 creates a "ticket tax" applicable to commercial airlines: "Under present law, the *air passenger ticket* and freight excise taxes are collected from *passengers* … by the *commercial air carriers*." *Id.* at 876 (emphasis added).

In 2011, the Senate Finance Committee considered an amendment to the Internal Revenue Code addressing the specific issue in this case – the IRS's improper treatment of fractional aircraft ownership as commercial aviation subject to the ticket tax. The Committee stated that the amendment was necessary to "*make clear*" that fractional aircraft owners who travel privately on their own planes are engaged in "*noncommercial aviation*" to which the section 4261 ticket tax does not apply:

> **The Committee notes that the IRS and FAA classify flights on aircraft that are part of a fractional ownership program differently. Under the FAA safety regulations, such flights are considered general aviation, while the IRS classifies such flights as commercial aviation for tax purposes. The Committee wishes to make clear that fractional flights should be considered as noncommercial aviation for tax purposes.**

> [S. Rep. 112-1, 2011 WL 520955, at *9 (emphasis added)]

In February 2012, Congress passed the amendment the Senate Finance Committee had considered the year before. In doing so, it explained that it was "*clarifying and reaffirming*" the existing law in specifying that fractional aircraft owners who travel privately on their own planes

are subject to the separate "fuel tax" on noncommercial aircraft, not the ticket tax in section 4261:

> **The Federal Aviation Administration recognized that fractional [aviation] is noncommercial in 2003, but the Internal Revenue Service is still trying to tax it the same as a commercial airline ticket, despite the fact that fractional owners own their planes. Today we are <u>clarifying and reaffirming</u> that fractional aviation is <u>non-commercial</u> aviation. This bill clearly states that instead of being subject to the commercial ticket tax [imposed by § 4261], as the IRS has asserted, fractional flights will pay the <u>fuel tax</u> used in noncommercial aviation, plus a fractional surtax.**

> [158 Cong. Rec. H445-04, H456 (emphasis added)]

When section 4261 and other related statutes describing the *ticket* tax are read against the backdrop of this legislative history, Congress unquestionably intended section 4261 to apply to passengers who purchase commercial flights, not to amounts private aircraft owners pay NetJets for support services that assist the owners in traveling privately on their own airplanes.

> **3. <u>Any Ambiguity As To Whether "Taxable Transportation" Is Broad Enough To Sweep In Support Services For Privately Owned Aircraft That Are Provided By NetJets Must, As A Matter Of Law, Be Resolved In Favor Of NetJets And The Aircraft Owners It Supports</u>**

The text, statutory structure and legislative history of the section 4261 ticket tax makes clear that Congress never intended that it apply to payments by private aircraft owners for support services of the kind provided by NetJets.  Those services simply do not constitute "taxable transportation" under section 4261.  But even if there were an equally plausible definition of "taxable transportation" that was broad enough to sweep in private aircraft maintenance and support services, the tax could not be imposed on payments for such support services because the ambiguity of the statute must be construed in the manner most favorable to the taxpayer.

As the Supreme Court made clear in 1923, any doubt as to the breadth or inclusiveness of a term upon which a tax is based – here, "taxable transportation" – "must be resolved against the government and in favor of the taxpayer." *United States v. Merriam*, 263 U.S. 179, 187-88 (1923). (The courts "cannot extend the power to tax beyond the clear authority of the statute." *United States v. King Trailer Co.*, 350 F.2d 947, 948 (9th Cir. 1965). Thus, where there is "doubt as to connotation of the term that is the basis of imposition of a tax" [here, "taxable transportation"], "and another meaning might be adopted" [here, that "taxable transportation" does not include aviation support services necessary for private air travel], "the fact of its use in a tax statute would incline the scale to the construction most favorable to the taxpayer." *Old Colony R. Co. v. Commissioner*, 284 U.S. 552, 561 (1932). Simply stated, any "doubts must be resolved against the government and in favor of taxpayers." *Miller v. Standard Nut Margarine Co. of Florida*, 284 U.S. 498, 508 (1932).

Providing maintenance and operational support services to fractional owners of private aircraft simply does not constitute the sale of "taxable transportation" and therefore does not come within the scope of the ticket tax. But if doubt exists as to the parameters of the term "taxable transportation," it must be construed in the manner most favorable to NetJets – that the ticket tax does not apply to payments it receives for aircraft support services it provides to private aircraft owners.

       **4.**     **<u>The IRS's Own Revenue Ruling Provides That The Payments A Private Aircraft Owner Makes For Maintenance And Operational Support Such As That Provided By NetJets Are Not Subject To The Ticket Tax</u>**

Consistent with the wording and legislative history of section 4261, the IRS itself has recognized that aircraft management services like those provided by NetJets do not constitute the provision of "taxable transportation," and thus are not subject to the ticket tax. In Rev. Rul. 58-

215, a corporation purchased an aircraft "for the purpose of transporting its own personnel and to use as a 'flying-office car.'"  The corporation hired "an airline company as its agent to service, maintain, overhaul and operate [the] aircraft" and paid the airline company for its services.  Id. The IRS ruled that the payments the corporation made to the airline company were *not* payments for taxable transportation under section 4261.  Rather, the airline company was merely acting as the corporation's agent for the purpose of facilitating the corporation's transportation of its own personnel on its own airplane:

> **Where a corporation owns an aircraft and appoints an airline company as its agent to service, maintain, overhaul, and operate such aircraft for the purpose of transporting the corporation's personnel, the airline company is <u>not</u> <u>furnishing transportation</u> <u>service</u> to such corporation within the purview of section 4261 of the Internal Revenue Code of 1954. Therefore, amounts paid for such services are not subject to the tax on transportation of persons.**

[Rev. Rul. 58-215, 1958-1 C.B. 439 (emphasis added)]

Rev. Rul. 58-215 makes clear that an aircraft management company that manages and operates an aircraft for its owner is not providing taxable transportation because, as the owner's agent, the management company is simply an extension of the owner.  The management company acts at the direction of the owner, and therefore the owner is transporting herself, even though she is paying someone else to manage and operate the aircraft for her.

The relationship between the corporation and the airline company that the IRS found to be an agency relationship in Rev. Rul. 58-215 is indistinguishable in any material respect from the relationship between NetJets and the owners who use its services:

- In Rev. Rul. 58-215, the corporation "made a bona fide purchase of an aircraft from an airline company…."  Here, the owners who use NetJets' management services are bona fide purchasers of their aircraft interests.

- In Rev. Rul. 58-215, the corporation "entered into an agreement which appointed the airline company its agent to service, maintain, overhaul, and operate the

36

aircraft." Here, the owners enter into management agreements with NetJets that require NetJets to service, maintain, overhaul and operate the aircraft on the owner's behalf.

- In Rev. Rul. 58-215, the corporation paid all maintenance and operational expenses. Here, the owners pay these same expenses through the fees they pay to NetJets.

- In Rev. Rul. 58-215, the corporation paid "to the airline company a certain sum for each hour flown for gasoline, oil, and hydraulic fluid." Here, the fractional owner pays these costs via the occupied hourly fee.

- In Rev. Rul. 58-215, the management company "furnish[ed], subject to the approval of the corporation, the pilot and co-pilot to operate the aircraft." The corporation could, in its discretion, have the management company relieve the pilot and co-pilot of their duties and assign new pilots subject to the corporation's approval. Here, NetJets furnishes the pilots but does so subject to the discretion of the owner, who may reject any pilots merely by advising NetJets.

- In Rev. Rul. 58-215, the corporation paid "to the airline company the salaries of the flight crew…." Here, the fractional owner pays the flight crew salaries through the monthly management fees.

There simply are no material differences between the relationship the aircraft management company had with the corporation in Rev. Rul. 58-215 and the relationship NetJets has with the fractional owners whose aircraft it manages. The fractional owners who use NetJets' services are principals of their aircraft, and NetJets acts as their agent by providing them with maintenance and operational support services that assist them in flying where they want, when they want, on their private airplanes.

Rev. Rul. 58-215 confirms what the statutory text, structure and legislative history of section 4261 plainly show – that the ticket tax does not apply to payments for the aircraft management services that NetJets provides to private aircraft owners.

**5.** **The *Executive Jet* Decision Relied Upon By The Government As Support For Imposing The Ticket Tax Was Not Good Law During The Assessment Period**

The Government relies on the Federal Circuit's decision in *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463 (Fed. Cir. 1997) ("*Executive Jet*"), as support for its argument that NetJets provides commercial transportation that is subject to the ticket tax. That decision, however, was not good law during the Assessment Period, and thus offers no support for the tax assessments at issue in this case.

As noted above, the court in *Executive Jet* based its decision on its conclusion that fractional owners were not *bona fide* owners but rather were essentially passengers on charter flights. The 2003 FARs, however, hold directly to the contrary. The FARs expressly recognize fractional ownership as a *bona fide* form of private aircraft ownership that is fundamentally different than charter service. The FARs also expressly require that fractional owners enter into the very management and dry lease agreements that *Executive Jet* held were merely "form over substance."

And, while the court in *Executive Jet* held that fractional ownership arrangements were nothing more than an exclusive charter business, the FAA now has expressly recognized, as a matter of federal law, that this is not true; that management of fractionally owned aircraft *is not* a commercial charter business. In fact, the FARs expressly prohibit fractional program flights from being conducted "for the transportation of persons or property for compensation or hire." 14 C.F.R. § 91.1005(a). As set forth above, the Internal Revenue Code defines "commercial aviation" as the "use of an aircraft in a business of transporting persons or property for compensation or hire by air." Thus, as a matter of federal law, the NetJets program, as an FAA-certified fractional ownership program, does not engage in the type of commercial activity that

the *Executive Jet* court relied upon as its basis for holding that EJA was subject to taxation under section 4261. Instead, the FARs establish that NetJets is a "*fractional ownership program manager*" that provides "*administrative and aviation support services*" to private aircraft owners. 14 C.F.R. § 91.1001(b)(8)-(9) (emphasis added).

The FAA's adoption of the 2003 FARs means that *Executive Jet* is not good law today, nor was it good law during the Assessment Period in this case. Where, as here, the underlying factual and legal premise for a federal court decision has changed, that decision has *no* precedential value and *no* collateral estoppel effect on subsequent disputes between the same parties. *See Commissioner v. Sunnen*, 333 U.S. 591, 599-600 (1948) (holding that "a subsequent modification … in the controlling legal principles may make that [prior] determination obsolete" and collateral estoppel "must be confined to situations where … the controlling facts and applicable legal rules remain unchanged"). The IRS is simply wrong in rejecting the position of the FAA and attempting to nonetheless impose the ticket tax on the fees charged by NetJets on the basis of the *Executive Jet* decision.

Because NetJets does not sell "taxable transportation" under section 4261, NetJets is entitled to a refund of the ticket taxes it collected and remitted on occupied hourly fees during the tax periods at issue, a refund of the divisible portions it paid with respect to the IRS's retroactive assessments against monthly management and fuel variable surcharge fees, and abatement of the unpaid amounts of those assessments. [See attached Schedules A and B]

**B.** **The Monthly Management Fee That Owners Pay To NetJets Is Not An "Amount Paid" For "Transportation" Under Section 4261**

Even assuming, *arguendo*, that the aircraft management services NetJets provides to private owners could be construed as "taxable transportation" under section 4261, NetJets nonetheless is entitled to summary judgment on its claim for refund and abatement of the taxes

assessed against its monthly management fees, because those fees do not constitute an "amount paid" for "taxable transportation."

Section 4261 does not simply tax taxable transportation; rather, it taxes "*amounts paid*" for taxable transportation.   Here, the monthly management fees that fractional owners pay to NetJets each month are not payments for transportation.  As such, they are not subject to taxation under section 4261 as a matter of law.

Whereas the occupied hourly fee covers costs a fractional owner incurs in actually using her aircraft, such as flight planning and landing fees, the monthly management fee covers the costs associated with *owning* an aircraft, irrespective of whether it is ever flown.  These costs include insurance, hangaring costs, and crew salaries.

Fractional owners are not purchasing "transportation" when they pay the monthly management fee.  Indeed, they are required to pay that fee each month even if they do not take a single flight.  Even the Government has recognized that the monthly management fee is not a payment for "transportation" under section 4261.  In the *Executive Jet* litigation, the Government expressly took the position that only the occupied hourly fee was subject to the section 4261 tax, and not the monthly management fee, because the monthly management fee is a fee for "management services," not a fee for "transportation":

> **[T]he fee structure of the NetJets program demonstrates that EJA had two <u>separate</u> roles with respect to these flights – that of <u>transporting</u> persons or property by air and that of providing <u>aircraft</u> <u>management</u> <u>services</u>.  The management agreement established two separate fees – a monthly management fee, and an occupied hourly rate charge …. For its management services, EJA was paid a monthly fee, which was $22,429 in 1993.  The monthly management fees covered the <u>fixed</u> <u>costs</u> associated with <u>owning</u> or leasing the aircraft.**
>
> **But EJA also received an additional fee of $1,060 per**

> **hour for <u>actual</u> <u>flight</u> <u>time</u> in 1993. The hourly fee included the <u>direct</u> <u>operating</u> <u>costs</u> associated with operating the owner's flights on their aircraft or an interchange aircraft …. The hourly charge was only incurred for <u>actual</u> <u>flight</u> <u>time</u>; if Texaco Air chose not to fly in a particular year, it did not incur the hourly rate charge, even though EJA was still <u>managing</u> its aircraft….**

> [Strapp Decl. Ex. 15, United States App. Brief at pg. 14]

While NetJets disputes the Government's argument in *Executive Jet* that the occupied hourly fee is a payment for commercial "transportation" under section 4261, especially in view of the 2003 FARs, it is nonetheless noteworthy that the Government *conceded* in *Executive Jet* that the monthly management fee is *not* a fee for *transportation* but rather a fee for *managing* the owner's aircraft. With respect to its characterization of the monthly management fee, the Government was correct – the monthly management fee is not a payment for transportation; rather, it covers costs that an owner must incur to maintain and support her aircraft.

Because the monthly management fee is not an "amount paid" for *transportation*, it is not taxable as a matter of law under section 4261 of the Internal Revenue Code. As such, NetJets is entitled to summary judgment on its claims for abatement of the IRS's retroactive assessments against NetJets' monthly management fees, its claims for refund of the divisible portions of those assessments that NetJets has paid, and the Government's counterclaim seeking to collect those assessments.

**C.   <u>The IRS's December 1992 TAM Prohibited It From Retroactively Assessing The Ticket Tax Against Monthly Management And Fuel Variable Surcharge Fees</u>**

There is a third independent reason why NetJets is entitled to summary judgment on its claims for refund and abatement of the IRS's retroactive tax assessments against monthly management and fuel variable surcharge fees: the IRS is legally bound by the position it declared

41

in the December 1992 TAM that *only* the occupied hourly fee is an "amount paid" for taxable transportation.

Section 7805(b) of the Internal Revenue Code grants the Treasury Secretary discretion to "prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect." 26 U.S.C. § 7805(b)(8). Pursuant to section 7805(b), the Secretary promulgated a regulation, codified at 26 C.F.R. § 601.105, limiting the IRS's discretion to retroactively revoke a TAM it has issued to a particular taxpayer. The regulation provides in pertinent part as follows:

> [A] holding in a technical advice memorandum that modifies or revokes a holding in a prior technical advice memorandum will … be applied retroactively, with one exception. If the new holding is less favorable to the taxpayer, it will generally not be applied to the period in which the taxpayer relied on the prior holding in situations involving continuing transactions of the type described in §§ 601.201(l)(7) and 601.201(l)(8).

> [26 C.F.R. § 601.105(b)(2)(viii)]

One example of a "continuing transaction" is particularly compelling here. Section 601.201(l)(7) gives an example of a taxpayer who, like NetJets, declines to pass along an excise tax to its customers in reliance on an IRS ruling that the tax does not apply:

> [I]f a taxpayer rendered service or provided a facility which is subject to the excise tax on services or facilities, and in reliance on a ruling issued to the same taxpayer did not pass the tax on to the user of the service or the facility, the Assistant Commissioner (Technical) ordinarily will restrict the retroactive application of the revocation or modification of the ruling.

> [26 C.F.R. § 601.201(l)(7) and (l)(8)]

In addition to this Treasury Regulation, the IRS also adopted Revenue Procedures that restrict the IRS's ability to retroactively revoke a TAM.[7] Revenue Procedure 2 provides in relevant part as follows:

> If an issue addressed in the TAM relates to a continuing action or a series of actions, it is generally applied until it is withdrawn or until the conclusion is modified or revoked by a final decision in favor of the taxpayer with respect to that issue, the enactment of legislation, the ratification of a tax treaty, a decision of the United States Supreme Court, or the issuance of temporary regulations, final regulations, a revenue ruling, or other statement published in the Internal Revenue Bulletin…. If a new holding in a TAM is less favorable to the taxpayer than the holding in an earlier TAM, the new holding is generally not applied to the period when the taxpayer relied on the earlier holding. It will be applied to that period, however, if material facts on which the earlier TAM was based have changed.
>
> [Rev. Proc. 2014-2, § 13.03, 1 I.R.B. 90][8]

These Treasury Regulations and Revenue Procedures establish three important principles. *First*, they establish that the taxpayer that is the subject of a particular TAM is entitled to rely on the IRS's position in the TAM until that TAM is withdrawn, revoked or modified. *Second*, they establish that a TAM can be revoked or modified *only* through the enactment of legislation, the ratification of a tax treaty, a decision of the United States Supreme Court, or the issuance of

---

[7]      An IRS "Revenue Procedure" is "a statement of procedure that affects the rights or duties of taxpayers or other members of the public under the [Internal Revenue] Code and related statutes …." 26 C.F.R. § 601.601(d)(2)(i)(b). The IRS publishes its Revenue Procedures in the Internal Revenue Bulletin, which "is the authoritative instrument of the Commissioner of Internal Revenue for the publication of official rulings and procedures of the Internal Revenue Service …." 26 C.F.R. § 601.601(d)(2)(ii)(a). "The purpose of publishing … revenue procedures in the Internal Revenue Bulletin is to promote correct and uniform application of the tax laws …." 26 C.F.R. § 601.601(d)(2)(iii).

[8]      This Revenue Procedure existed in 1992 when the IRS issued the December 1992 TAM regarding EJA, *see* Rev. Proc. 92-2, §14.04-.05, 1992-1 I.R.B. 146, and it has existed each and every year since then. *See* Rev. Proc. 93-2, 1993-1 I.R.B. 50; 94-2, 1994-1 I.R.B. 60; 95-2, 1995-1 I.R.B. 64; 96-2, 1996-1 I.R.B. 60; 97-2, 1997-1 I.R.B. 64; 98-2; 1998-1 I.R.B. 74; 99-2, 1999-1 I.R.B. 73; 2000-2, 2000-1 I.R.B. 73; 2001-2, 2001-1 I.R.B. 79; 2002-2, 2002-1 I.R.B. 82; 2003-2, 2003-1 I.R.B. 76; 2004-2, 2004-1 I.R.B. 83; 2005-2, 2005-1 I.R.B. 86; 2006-2, 2006-1 I.R.B. 89; 2007-2, 2007-1 I.R.B. 88; 2008-2, 2008-1 I.R.B. 90; 2009-2, 2009-1 I.R.B. 87; 2010-2, 2010-1 I.R.B. 90; 2011-2, 2011-1 I.R.B. 90; 2012-2, 2012-1 I.R.B. 92; 2013-2, 2013-1 I.R.B. 92; 2014-2, 2014-1 I.R.B. 90.

regulations, a revenue ruling, or other statement published in the Internal Revenue Bulletin relating specifically to that TAM. *Third*, they establish that, in the event a TAM is revoked or modified in a manner that is less favorable to the taxpayer, the new holding *cannot* be applied retroactively to the taxpayer unless the material facts on which the original TAM was based have changed.

In this case, the IRS took the position in its December 1992 TAM that only EJA's (and now NetJets') occupied hourly fee is taxable under section 4261 as an "amount paid for air transportation." As explained above, the IRS expressly agreed to this construction of the December 1992 TAM in early 1993 and then reconfirmed its position repeatedly in the *Executive Jet* litigation that followed.

There is no dispute that NetJets relied on the December 1992 TAM during the tax periods at issue, as it was entitled to do, by collecting and remitting the section 4261 tax on only the occupied hourly fees it received from fractional owners. There also is no dispute that the December 1992 TAM has never been withdrawn, revoked or modified. [Strapp Decl. ¶ 36] [Kutten Decl. ¶ 41] The IRS has never issued any notice of withdrawal to NetJets, nor has there been any legislation, tax treaty, Supreme Court decision, regulation, revenue ruling, or other statement published in the IRS Bulletin holding that NetJets is required to collect and remit ticket taxes on any fees other than the occupied hourly fee. Because the December 1992 TAM has never been withdrawn, revoked or modified, the IRS violated its own Treasury Regulations and Revenue Procedures by retroactively assessing the ticket tax against NetJets' monthly management and fuel variable surcharge fees. Those assessments are therefore unlawful and must be abated.

In *Morton v Ruiz*, 415 U.S. 199 (1974), the Supreme Court recognized that where, as here, a person's rights are affected by the procedural rules of a federal agency, that agency is bound to follow those rules:

> Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.  This is so even where the internal procedures are possibly more rigorous than otherwise would be required.
>
> [*Id.* at 235]

*Accord*: *Vitarelli v. Seaton*, 359 U.S. 535, 538 (1959) ("Having chosen to proceed against petitioner on security grounds, the Secretary here … was bound by the regulations which he himself had promulgated for dealing with such cases, even though without such regulations he could have discharged petitioner summarily.").

Federal courts applying this principle have held repeatedly that the IRS is required to follow its own Treasury Regulations and Revenue Procedures prohibiting the retroactive assessment of taxes.   For example, in *Thomas G. Faria Corporation v. United States*, 77-1 USTC 16,251, 1977 WL 3812 (Cl. Ct. 1977), the court held that the IRS acted unlawfully by retroactively assessing excise taxes against the plaintiff under section 4061(b) of the Internal Revenue Code where the IRS had previously issued a private letter ruling ("PLR") to the plaintiff holding that its sales of the product at issue were not subject to that tax.

In *Faria*, the IRS issued a PLR in 1954 that the plaintiff's sales of waterproof tachometers were not subject to the excise tax on "automobile parts and accessories."  Eleven years later, in 1965, the IRS issued a revenue ruling revoking the position it had taken in the 1954 PLR.  After issuing the revenue ruling, the IRS retroactively assessed the excise tax against plaintiff's sales of waterproof tachometers for the years 1963 and 1964.  The court held that the IRS was prohibited from retroactively assessing the excise tax because of a Revenue Procedure,

similar to the one in this case, limiting retroactive revocation of PLRs. The court found that the factors necessary to prohibit retroactive revocation were present, and thus the IRS's retroactive assessment was unlawful:

> [I]t must be held that defendant's retroactive revocation in the present case constitutes a clear abuse of discretion…. Rev. Rul. 65-197 cannot be retroactively applied to plaintiff without the IRS violating its own procedural rules.
>
> \*   \*   \*
>
> For the foregoing reasons, I have concluded that the Faria waterproof electric tachometer for gasoline engines was not taxable to plaintiff under section 4061(b) during the period from April 1, 1963 through September 30, 1965.
>
> [*Id.* at \*12-\*13]

Similarly, in *Lesavoy Foundation v. Commissioner*, 238 F.2d 589 (3d Cir. 1956), the court held that the IRS Commissioner acted unlawfully in retroactively revoking the plaintiff's exemption as a charitable organization and assessing taxes for prior years. At the time of the Commissioner's action, there was an IRS procedure in place that precluded retroactive revocation of any ruling regarding the exempt status of an organization "if the organization has acted in good faith in reliance upon the ruling issued to it and a retroactive revocation of such ruling would be to its detriment." *Id*. at 591 n.6. The court in *Lesavoy* recognized that the Commissioner "may change his mind when he believes he has made a mistake in a matter of fact or law," but held that "it is quite a different matter to say that having once changed his mind the Commissioner may arbitrarily and without limit have the effect of that change go back over previous years during which the taxpayer operated under the previous ruling." *Id.* at 591.

And, in *Boggs v. Commissioner*, 784 F.2d 1166 (4th Cir. 1986), the court held that the IRS could not retroactively apply its 1978 revocation of a tax-exemption ruling it had issued to

the plaintiff in 1962. While the court agreed that revocation was appropriate, it held that the IRS

violated its own regulations, and thus abused its discretion, by making the revocation retroactive:

> The Commissioner has authority to revoke retroactively a ruling …. The Commissioner has limited his discretion to take such action in Statement of Procedural Rules, 26 C.F.R. § 601.201(l)(5) ….
>
>              \*   \*   \*
>
> The Commissioner is required to abide by Treasury Regulation 26 C.F.R. § 601.201(l)(5) because it is reasonably based on I.R.C. § 7805(b)…. Because the departure of two employees in 1972 was not material, the Commissioner abused his discretion by retroactively revoking in 1978 his 1962 ruling …. We agree with the conclusion expressed in *Lansons*, 622 F.2d at 778 "[T]he Commissioner's failure to abide strictly by his own regulations limiting retroactive revocation of a favorable ruling amounts to an abuse of discretion."
>
> [*Id.* at 1169, 1171]

*Accord: Lansons, Inc. v. Commissioner*, 622 F.2d 774 (5th Cir. 1980) (holding that the

IRS's procedural regulations prohibited it from retroactively revoking the tax-exempt status of

plaintiff's profit-sharing trust); *Democratic Leadership Council, Inc. v. United States*, 542 F.

Supp. 2d 63 (D.D.C. 2008) (awarding tax refund to plaintiff because IRS abused its discretion by

retroactively revoking plaintiff's tax-exempt status in violation of applicable Treasury

Regulation); *Phillies v United States*, 153 F. Supp. 2d 612 (E.D. Pa. 2001) (holding that IRS

could not retroactively revoke private letter ruling that certain payments were not taxable

because retroactivity was not permitted under applicable Treasury Regulation); *Presbyterian &*

*Reformed Publishing Co. v. Commissioner*, 79 T.C. 1070, 1089 (T.C. 1982) ("Where … the

Commissioner has chosen, in the exercise of his wide discretion, to impose discretionary limits,

he must abide by those limits…. In his Rev. Proc. 80-25, the Commissioner has limited the

sweep of retroactivity in cases involving a material change to the date of such change. We do

47

not think that such a material change occurred in 1969, and hold that respondent abused his discretion in making the revocation effective in 1969."), *reversed on other grounds*, 743 F.2d 148 (3d Cir. 1984).[9]

These authorities make it clear that the retroactive revocation of a TAM or letter ruling is unlawful where such action is prohibited by IRS Treasury Regulations or Revenue Procedures. Here, Treasury Regulation 601.105 and Revenue Procedure 2 prohibit retroactive assessment of the section 4261 tax against NetJets' monthly management and fuel variable surcharge fees. Thus, like the retroactive actions of the IRS in the cases above, the IRS's retroactive assessments against NetJets in this case are unlawful. In fact, the IRS's actions here are even more egregious than those in the cases above, given that, here, the IRS did not even modify or revoke the December 1992 TAM before issuing its retroactive tax assessments.

As such, NetJets is entitled to summary judgment abating the IRS's retroactive tax assessments against monthly management and fuel variable surcharge fees and refunding the divisible portions of those assessments that NetJets has already paid.[10]

---

[9]       The IRS itself has recognized on numerous occasions that it is bound by its own rules and regulations, and thus cannot retroactively revoke a TAM or letter ruling where such action is prohibited by a Treasury Regulation or Revenue Procedure. *See, e.g.*, TAM 200703019 (Oct. 23, 2006); TAM 200604040 (Oct. 12, 2005); TAM 9802001 (Sept. 9, 1997); TAM 9641002 (Oct. 11, 1996); TAM 9519001 (Jan. 27, 1995); TAM 9508003 (Nov. 10, 1994); TAM 9143003 (July 11, 1991); TAM 8025020 (March 19, 1980).

[10]       Under Revenue Procedure 2, only the taxpayer that is the subject of a TAM may rely on the TAM. *See* Rev. Proc. 2014-2, § 13.04. In this case, each of the NetJets entities was entitled to rely on the December 1992 TAM. EJA, the entity that was the subject of the TAM, changed its name to NJA in 2002. Thus, NJA was entitled to rely on the December 1992 TAM because it was the same entity as EJA. As for NJLA and NJI, they were formed after the December 1992 TAM when NetJets decided to re-organize and divide its fractional aircraft management program among three subsidiaries (NJA, NJLA, and NJI). The fractional management services that NJLA and NJI provided, however, were originally performed by EJA/NJA and thus were part of the same "NetJets program" that was the subject of the December 1992 TAM. [Noe Decl. ¶¶ 6-7] As such, NJLA and NJI were entitled to rely on the December 1992 TAM as successors of EJA/NJA. *See* TAM 200604040, 2006 WL 208433 (Jan. 27, 2006) (holding that successor corporation was entitled to rely on 1981 TAM, and thus revocation of that TAM would be applied prospectively only).

**D.    NetJets Is Not Secondarily Liable For Payment Of The Section 4261 Tax On Monthly Management And Fuel Variable Surcharge Fees Because The IRS Failed To Meet Its Duty To Provide Clear Guidance That Those Fees Are Subject To The Tax**

NetJets is entitled to summary judgment for a fourth separate and independent reason.  In addition to the IRS's legal duty to follow its position from the December 1992 TAM, the IRS also had an independent duty, based on Supreme Court precedent, to provide clear, advance guidance to NetJets that the IRS intended to apply the section 4261 tax to monthly management and fuel variable surcharge fees.  The IRS, however, never provided any such guidance.  To the contrary, the only guidance the IRS provided to NetJets, the December 1992 TAM, provided that only the occupied hourly fee was subject to the section 4261 tax.  Because the IRS failed to meet its duty to provide clear guidance, NetJets is entitled to summary judgment in its favor with respect to the IRS's retroactive tax assessments against monthly management and fuel variable surcharge fees.

In *Central Illinois Public Service Company v. United States*, 435 U.S. 21, 31 (1978), the Supreme Court held that the IRS cannot assess secondary liability against a person for failure to collect a tax on particular types of payments unless the IRS had previously given *"precise and not speculative" notice* to that person that *those types of payments* were subject to the tax.  In *Central Illinois*, the IRS retroactively assessed secondary liability against the plaintiff-company for failing to withhold taxes on certain reimbursements the company paid to its employees for lunch expenses while traveling.  In holding the assessment to be unlawful, the Court noted that "not one regulation or ruling [by the IRS] required withholding on any travel expense reimbursement[,]" and that "[n]o employer, in viewing the regulations [in effect at that time], could reasonably suspect that a withholding obligation existed." 435 U.S. at 32.  Given this lack

of guidance from the IRS, the Court concluded "it [was] hardly reasonable to require an employer to fill the gap on its own account." *Id.*

The United States Claims Court reached a similar decision in *General Elevator Corporation v. United States*, 20 Cl. Ct. 345 (1990). There, the IRS imposed retroactive tax liability on an employer for failing to withhold taxes on per diem travel payments it made to its employees. Although the court held the payments were subject to withholding, the court nevertheless awarded a refund to the employer because the IRS had not provided advance notice that the specific types of payments at issue were subject to withholding:

> [P]laintiff has shown that it had inadequate notice of the fact that the IRS viewed per diem payments under these circumstances as being subject to withholding. Consequently, the court finds that adequate notice to plaintiff, prior to the years in question, *was a legal requirement which was not met* by the Revenue Rulings, interpretations, and case law, and that defendant cannot be allowed to retroactively impose a withholding obligation upon plaintiff.
>
> [*Id.* at 354 (emphasis added)]

In this case, the IRS is attempting to impose secondary liability on NetJets under section 4263(c) of the Internal Revenue Code, which provides as follows: "Where any tax imposed by section 4261 is not paid at the time payment for transportation is made, then … such tax shall be paid by the carrier providing the initial segment of such transportation …." The IRS contends that NetJets should have collected the ticket tax on the monthly management and fuel variable surcharge fees it charged to aircraft owners, and thus the IRS has retroactively imposed hundreds of millions of dollars of secondary tax liability against NetJets for its failure to do so.

Under *Central Illinois* and *General Elevator*, it is unlawful for the IRS to attempt to impose, after the fact, this enormous tax liability on NetJets, because the IRS failed to give NetJets any guidance that the monthly management and fuel variable surcharge fees paid by

aircraft owners were subject to section 4261.  "[N]ot one regulation or ruling required" NetJets to collect the excise tax on those payments. *Central Illinois*, 435 U.S. at 32.  To the contrary, the IRS's actions with respect to NetJets and other fractional management companies indicated that the IRS believed the ticket tax to apply to occupied hourly fees only.

As explained above, the IRS's position under the December 1992 TAM, as reconfirmed by the IRS in the *Executive Jet* litigation, was that the section 4261 tax applied to the occupied hourly fee *only*.  But that isn't the only time the IRS took the position that the ticket tax applies only to occupied hourly fees.  It took the same position during administrative proceedings involving one of NetJets' competitors, Bombardier.

Prior to the *Executive Jet* decision, Bombardier had been collecting the ticket tax on monthly management fees it received from fractional owners. [Garvey Decl. ¶ 5]  After the *Executive Jet* decision was issued, Bombardier stopped collecting the tax on monthly management fees and also filed an administrative claim with the IRS for a refund of the ticket taxes it had collected on those fees for the periods prior to that decision. [Id.]  Bombardier's request for a refund prompted the IRS to conduct an examination of Bombardier's quarterly excise tax returns for certain periods, and, as part of that examination, the IRS issued a TAM in 2004 in which it took the position that the ticket tax applied to the occupied hourly fees *and* the monthly management fees that fractional owners paid to Bombardier. *See* TAM 200425048, 2004 WL 1369063. [Garvey Decl. ¶ 6]  As a result, the IRS denied Bombardier's request for refund and also retroactively assessed the ticket tax against monthly management fees for periods following the *Executive Jet* decision. [Id. ¶ 7] [11]

---

[11]     The 2004 Bombardier TAM had no effect on NetJets because, as set forth above in footnote 10, a TAM is binding on only the taxpayer that is the subject of the TAM.  The only TAM that applied to NetJets was the December 1992 TAM, which provided that only the occupied hourly fee was subject to the ticket tax.

Bombardier challenged the IRS's tax assessments through the agency's internal appeals process, and, at the conclusion of that appeal, the IRS *rescinded* its assessment against Bombardier's monthly management fees and *conceded that the ticket tax did not apply to anything but Bombardier's occupied hourly fees*. [Garvey Decl. ¶ 7]  In addition, the IRS actually *refunded* to Bombardier ticket taxes it had collected on monthly management fees for years prior to the *Executive Jet* decision. [Id.]  Notably, the IRS's concession and refund with respect to Bombardier included a number of tax quarters that are at issue in this case. [Id.]

Even as recently as last year, the IRS continued to take actions that are inconsistent with its position in this case that the ticket tax applies to monthly management and fuel variable surcharge fees.  In 2013, the IRS entered into a settlement with another of NetJets' competitors, PlaneSense, in which the IRS agreed that PlaneSense did not owe ticket taxes on monthly management or fuel variable surcharge fees for the period from April 1, 2004 through April 1, 2012. [Arber Decl. ¶¶ 19-23]  Thus, the IRS has now treated both Bombardier and PlaneSense more favorably than NetJets with respect to the imposition of the ticket tax for tax periods at issue in this case.  The IRS has no rational basis for this inconsistent treatment of competitors. *See, e.g.*, *IBM v. United States*, 343 F.2d 914, 923 (Ct. Cl. 1965) (holding that the IRS could not subject IBM's products to an excise tax for a period during which it exempted IBM's competitor's products from the same excise tax).

So, the IRS's December 1992 TAM, its position in *Executive Jet*, and its concession to Bombardier all indicated a position on the part of the IRS that the ticket tax applied only to the occupied hourly fees that aircraft owners paid to fractional management companies.  If that was not an accurate indication of the IRS's intentions regarding application of the ticket tax, then the IRS had a legal obligation to issue *precise* regulations or rulings making clear that the tax also

applied to a fractional management company's monthly management and fuel variable surcharge fees.  But the IRS never did so.  Between 1992 (when the December 1992 TAM was issued) and 2010 (when the assessments in this case were imposed), the IRS never once issued a regulation or published an interpretative ruling indicating that the monthly management or fuel variable surcharge fees are subject to the ticket tax.

As the Supreme Court made clear in *Central Illinois*, it was the IRS's legal obligation to publish regulations or rulings making clear that the IRS intended to subject monthly management and fuel variable surcharge fees to the ticket tax.  But the IRS never met this obligation.  To the contrary, the IRS gave every indication that only occupied hourly fees were subject to the tax.  Given the IRS's failure to publish any regulation or ruling giving notice that it was changing its position, NetJets was not required "to fill the gap on its own account." *Central Illinois*, 435 U.S. at 32.  It is therefore unlawful – and completely unfair – for the IRS to assess retroactively hundreds of millions of dollars of ticket taxes against NetJets on monthly management and fuel variable surcharge fees.

## V.    <u>Conclusion</u>

For each of the four separate and independent reasons set forth herein, Plaintiffs NetJets Large Aircraft, Inc., NetJets Aviation, Inc., and NetJets International, Inc. respectfully move the Court to enter summary judgment (i) refunding to them the ticket taxes and divisible payments set forth on the attached Schedules A and B, plus interest, and (ii) abating the unpaid ticket tax assessments set forth on the attached Schedule B.

Respectfully submitted,

/s/ John W. Zeiger
John W. Zeiger  (0010707), Trial Attorney
Bradley T. Ferrell (0070965)
ZEIGER, TIGGES & LITTLE LLP
41 South High Street, Suite 3500
Columbus, Ohio 43215
Telephone:  (614) 365-9900
Facsimile:   (614) 365-7600
Email:  zeiger@litohio.com
            ferrell@litohio.com

Attorneys for Plaintiffs and Counterclaim
Defendants NetJets Large Aircraft, Inc.,
NetJets International, Inc., and
NetJets Aviation, Inc.

Colleen K. Nissl (0008155)
Senior Vice President and General Counsel
NetJets, Inc.
4111 Bridgeway Avenue
Columbus, Ohio 43219
Telephone:  (614) 239-2934
Facsimile:  (614) 239-3632
Email: cnissl@netjets.com

Co-Counsel for Plaintiffs and Counterclaim Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day April, 2014, I have electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

> Thomas P. Cole
> Tax Division
> U.S. Department of Justice
> Post Office Box 55
> Ben Franklin Station
> Washington, DC 20044
>
> Counsel for Defendant

/s/ John W. Zeiger
John W. Zeiger (0010707)

948-001:486491

# SCHEDULE A

NetJets Large Aircraft, Inc. et al. v. United States, Case No. 2:11-cv-1023 (S.D. Ohio)

## SCHEDULE A

**Federal Air Transportation Excise Tax -Form 720**
**Schedule A- Summary of Refund Claims Filed**

|  | Excise Tax Quarter | Amount of Refund Claim |
|---|---|---|
| **NetJets Large Aircraft, Inc.** | | |
| **(EIN: 20-0504705)** | | |
|  | 200312 | $12,296 |
|  | 200403 | $11,058 |
|  | 200406 | $16,109 |
|  | 200409 | $39,551 |
|  | 200412 | $24,103 |
|  | 200503 | $55,586 |
|  | 200506 | $37,412 |
|  | 200509 | $20,076 |
|  | 200512 | $1,854 |
|  | 200603 | $15,667 |
|  | 200606 | $8,126 |
|  | 200609 | $6,072 |
|  | 200612 | $7,520 |
|  | 200703 | $19,380 |
|  | 200706 | $12,484 |
|  | 200709 | $12,323 |
|  | 200712 | $8,990 |
|  | 200803 | $7,128 |
|  | 200806 | $14,360 |
|  | 200809 | $6,626 |
|  | 200812 | $9,195 |
|  | 200903 | $7,460 |
|  | 200906 | $6,132 |
|  |  | $359,508 |

SCHEDULE A

NetJets Large Aircraft, Inc. et al. v. United States, Case No. 2:11-cv-1023 (S.D. Ohio)

## SCHEDULE A

**Federal Air Transportation Excise Tax -Form 720**
**Schedule A- Summary of Refund Claims Filed**

|  | Excise Tax Quarter | Amount of Refund Claim |
|---|---|---|
| **NetJets International, Inc.** |  |  |
| **(EIN: 22-3378514)** |  |  |
|  | 200506 | $1,312,499 |
|  | 200509 | $1,139,882 |
|  | 200512 | $1,206,511 |
|  | 200603 | $1,397,462 |
|  | 200606 | $1,486,479 |
|  | 200609 | $1,364,590 |
|  | 200612 | $1,420,087 |
|  | 200703 | $1,556,781 |
|  | 200706 | $1,698,771 |
|  | 200709 | $1,550,710 |
|  | 200712 | $1,487,972 |
|  | 200803 | $1,904,903 |
|  | 200806 | $1,817,798 |
|  | 200809 | $1,482,339 |
|  | 200812 | $1,302,516 |
|  | 200903 | $1,367,779 |
|  | 200906 | $1,257,547 |
|  |  | $24,754,626 |

SCHEDULE A

NetJets Large Aircraft, Inc. et al. v. United States, Case No. 2:11-cv-1023 (S.D. Ohio)

## SCHEDULE A

**Federal Air Transportation Excise Tax -Form 720**
**Schedule A- Summary of Refund Claims Filed**

| | Excise Tax Quarter | Amount of Refund Claim |
|---|---|---|
| **NetJets Aviation, Inc.** | | |
| **(EIN: 31-0682096)** | | |
| | 200503 | $8,205,094 |
| | 200506 | $10,278,948 |
| | 200509 | $8,991,778 |
| | 200512 | $9,509,867 |
| | 200603 | $10,051,031 |
| | 200606 | $11,535,967 |
| | 200609 | $9,882,178 |
| | 200612 | $11,178,027 |
| | 200703 | $11,792,218 |
| | 200706 | $12,427,498 |
| | 200709 | $11,647,135 |
| | 200712 | $12,159,035 |
| | 200803 | $12,625,642 |
| | 200806 | $13,018,442 |
| | 200809 | $11,486,059 |
| | 200812 | $10,502,750 |
| | 200903 | $9,491,753 |
| | 200906 | $9,279,393 |
| | | $194,062,815 |

SCHEDULE A

# SCHEDULE B

NetJets Large Aircraft, Inc., et al. v. United States, Case No. 2:11-cv-1023 (S.D. Ohio)

SCHEDULE B

**Federal Air Transportation Excise Tax -Form 720**
**Summary of Assessment and Divisible Taxes Paid**

| | Excise Tax Quarter | Tax Assessed | Penalty | Interest | Reduction of Int Prev Allowed | Total | Divisible Portion | Request for Abatement |
|---|---|---|---|---|---|---|---|---|
| NetJets Aviation, Inc. (EIN: 31-0682096) | | | | | | | | |
| | 200503 | $11,029,699.00 | | $4,639,671.80 | | $15,669,370.80 | $3,366.47 | $15,666,004.33 |
| | 200506 | $11,501,833.00 | | $4,593,544.03 | | $16,095,377.03 | $3,052.21 | $16,092,324.82 |
| | 200509 | $11,998,146.00 | | $4,525,733.96 | | $16,523,879.96 | $4,314.23 | $16,519,565.73 |
| | 200512 | $13,156,901.00 | | $4,643,120.19 | | $17,800,021.19 | $2,616.13 | $17,797,405.06 |
| | 200603 | $14,118,822.00 | | $4,662,338.53 | | $18,781,160.53 | $3,335.69 | $18,777,824.84 |
| | 200606 | $14,352,365.00 | | $4,389,671.05 | | $18,742,036.05 | $3,104.96 | $18,738,931.09 |
| | 200609 | $14,642,689.00 | | $4,096,803.12 | | $18,739,492.12 | $2,680.37 | $18,736,811.75 |
| | 200612 | $14,966,454.00 | | $3,799,722.99 | | $18,766,176.99 | $3,124.54 | $18,763,052.45 |
| | 200703 | $16,121,903.00 | | $3,708,254.88 | | $19,830,157.88 | $3,278.23 | $19,826,879.65 |
| | 200706 | $16,756,660.00 | | $3,442,857.93 | | $20,199,517.93 | $3,276.96 | $20,196,240.97 |
| | 200709 | $17,210,343.00 | | $3,121,968.39 | | $20,332,311.39 | $2,552.16 | $20,329,759.23 |
| | 200712 | $18,833,334.00 | | $2,991,147.98 | | $21,824,481.98 | $3,558.07 | $21,820,923.91 |
| | 200803 | $20,776,065.00 | | $2,908,264.86 | | $23,684,329.86 | $4,520.09 | $23,679,809.77 |
| | 200806 | $21,599,350.00 | | $2,675,513.65 | | $24,274,863.65 | $6,348.10 | $24,268,515.55 |
| | 200809 | $21,448,177.00 | | $2,362,325.50 | $4,794.79 | $23,815,297.29 | $3,501.66 | $23,811,795.63 |
| | 200812 | $18,475,372.00 | | $1,707,294.41 | $4,830.41 | $20,187,496.82 | $3,687.07 | $20,183,809.75 |
| | 200903 | $15,559,392.00 | | $1,258,002.02 | | $16,817,394.02 | $3,571.80 | $16,813,822.22 |
| | 200906 | $14,452,745.00 | | $1,009,692.87 | | $15,462,437.87 | $4,075.91 | $15,458,361.96 |
| | | $287,000,250.00 | $0.00 | $60,535,928.16 | $9,625.20 | $347,545,803.36 | $63,964.65 | $347,481,838.71 |
| | | | | | | | $0.00 | $0.00 |

SCHEDULE B

## NetJets Large Aircraft, Inc., et al. v. United States, Case No. 2:11-cv-1023 (S.D. Ohio)

### SCHEDULE B

**Federal Air Transportation Excise Tax -Form 720**
**Summary of Assessment and Divisible Taxes Paid**

| | Excise Tax Quarter | Tax Assessed | Penalty | Interest | Total | Divisible Portion | Request for Abatement | Annual Totals | |
|---|---|---|---|---|---|---|---|---|---|
| NetJets Large Aircraft, Inc. (EIN: 20-0504705) | | | | | | | | | |
| | 200312 | $18,429.00 | $4,607.25 | $9,361.92 | $32,398.17 | $10,657.76 | $21,740.41 | *$10,657.76* | 2003 |
| | 200403 | $48,929.00 | $12,232.25 | $24,073.86 | $85,235.11 | $11,227.58 | $74,007.53 | | |
| | 200406 | $55,080.00 | $13,770.00 | $26,142.65 | $94,992.65 | $8,261.23 | $86,731.42 | | |
| | 200409 | $80,624.00 | $20,156.00 | $36,977.65 | $137,757.65 | $11,323.19 | $126,434.46 | | |
| | 200412 | $67,707.00 | $16,926.75 | $29,818.80 | $114,452.55 | $6,064.71 | $108,387.84 | *$36,876.71* | 2004 |
| | 200503 | $90,622.00 | $22,655.50 | $38,223.22 | $151,500.72 | $11,107.91 | $140,392.82 | | |
| | 200506 | $90,122.00 | $22,530.50 | $36,089.25 | $148,741.75 | $31,383.26 | $117,358.49 | | |
| | 200509 | $79,398.00 | $19,849.50 | $30,033.06 | $129,280.56 | $15,326.67 | $113,953.89 | | |
| | 200512 | $29,841.00 | $7,460.25 | $10,568.39 | $47,869.64 | $8,768.86 | $39,100.78 | *$66,586.70* | 2005 |
| | 200603 | $61,718.00 | $15,429.50 | $20,443.60 | $97,591.10 | $9,628.43 | $87,962.67 | | |
| | 200606 | $54,769.00 | $13,692.25 | $16,805.98 | $85,267.23 | $7,169.54 | $78,097.69 | | |
| | 200609 | $32,813.00 | $8,203.25 | $9,212.79 | $50,229.04 | $8,782.99 | $41,446.05 | | |
| | 200612 | $26,113.00 | $6,528.25 | $6,664.11 | $39,305.36 | $9,649.83 | $29,655.53 | *$35,230.79* | 2006 |
| | 200703 | $84,042.00 | $19,749.87 | $18,148.24 | $121,940.11 | $6,480.60 | $115,459.51 | | |
| | 200706 | $45,462.00 | $10,456.26 | $9,382.75 | $65,301.01 | $13,460.39 | $51,840.62 | | |
| | 200709 | $49,909.00 | $10,730.43 | $9,098.76 | $69,738.19 | $8,948.74 | $60,789.45 | | |
| | 200712 | $36,318.00 | $7,263.60 | $5,800.39 | $49,381.99 | $6,559.65 | $42,822.34 | *$35,449.38* | 2007 |
| | 200803 | $41,183.00 | $0.00 | $5,493.85 | $46,676.85 | $7,234.33 | $39,442.52 | | |
| | 200806 | $38,847.00 | $0.00 | $4,715.25 | $43,562.25 | $6,841.80 | $36,720.45 | | |
| | 200809 | $53,680.00 | $0.00 | $5,656.70 | $59,336.70 | $6,841.80 | $52,494.90 | | |
| | 200812 | $44,250.00 | $0.00 | $4,094.05 | $48,344.05 | $6,841.80 | $41,502.25 | *$27,759.73* | 2008 |
| | 200903 | $26,225.00 | $0.00 | $2,043.89 | $28,268.89 | $7,012.80 | $21,256.09 | | |
| | 200906 | $17,641.00 | $0.00 | $1,185.46 | $18,826.46 | $7,098.30 | $11,728.16 | *$14,111.10* | 2009 |
| | | $1,173,722.00 | $232,241.41 | $360,034.62 | $1,765,998.03 | $226,672.17 | $1,539,325.86 | $226,672.16 | |
| | | | | | | $0.00 | $0.00 | | |

SCHEDULE B

NetJets Large Aircraft, Inc., et al. v. United States, Case No. 2:11-cv-1023 (S.D. Ohio)

SCHEDULE B

**Federal Air Transportation Excise Tax -Form 720**
**Summary of Assessment and Divisible Taxes Paid**

| Excise Tax Quarter | Tax Assessed | Penalty | Interest | Reduction of Int Prev Allowed | Total | Divisible Portion | Request for Abatement | | |
|---|---|---|---|---|---|---|---|---|---|
| **NetJets International, Inc.** | | | | | | | | | |
| **(EIN: 22-3378514)** | | | | | | | | | |
| 200506 | $2,123,995.00 | $0.00 | $850,411.71 | | $2,974,406.71 | $3,489.21 | $2,970,917.50 | | |
| 200509 | $2,201,724.00 | $0.00 | $831,540.84 | $491.55 | $3,033,756.39 | $3,202.39 | $3,030,554.00 | | |
| 200512 | $2,795,540.00 | $0.00 | $989,488.14 | | $3,785,028.14 | $4,010.20 | $3,781,017.94 | *2005 Total* | **$10,701.80** |
| 200603 | $2,002,065.00 | $0.00 | $663,168.58 | | $2,665,233.58 | $3,410.94 | $2,661,822.64 | | |
| 200606 | $2,687,996.00 | $0.00 | $1,149,576.41 | | $3,837,572.41 | $3,771.36 | $3,833,801.05 | | |
| 200609 | $2,918,661.00 | $0.00 | $1,152,503.25 | $34.06 | $4,071,198.31 | $4,220.18 | $4,066,978.13 | | |
| 200612 | $2,744,591.00 | $0.00 | $700,426.49 | | $3,445,017.49 | $4,397.61 | $3,440,619.88 | *2006 Total* | **$15,800.09** |
| 200703 | $2,942,474.00 | $0.00 | $678,720.68 | | $3,621,194.68 | $4,636.21 | $3,616,558.47 | | |
| 200706 | $3,037,149.00 | $0.00 | $626,828.41 | | $3,663,977.41 | $3,729.70 | $3,660,247.71 | | |
| 200709 | $3,176,342.00 | $0.00 | $572,218.20 | $3,352.29 | $3,751,912.49 | $5,076.04 | $3,746,836.45 | | |
| 200712 | $3,583,121.00 | $0.00 | $572,264.77 | | $4,155,385.77 | $4,232.09 | $4,151,153.68 | *2007 Total* | **$17,674.04** |
| 200803 | $4,053,414.00 | $0.00 | $570,948.90 | | $4,624,362.90 | $4,311.87 | $4,620,051.03 | | |
| 200806 | $4,338,123.00 | $0.00 | $541,105.04 | | $4,879,228.04 | $6,241.79 | $4,872,986.25 | | |
| 200809 | $4,097,143.00 | $0.00 | $449,640.96 | | $4,546,783.96 | $3,744.85 | $4,543,039.11 | | |
| 200812 | $3,339,982.00 | $0.00 | $311,902.96 | | $3,651,884.96 | $4,910.38 | $3,646,974.58 | *2008 Total* | **$19,208.89** |
| 200903 | $2,822,440.00 | $0.00 | $230,306.44 | | $3,052,746.44 | $4,862.76 | $3,047,883.68 | | |
| 200906 | $2,658,350.00 | $0.00 | $188,055.01 | | $2,846,405.01 | $4,222.64 | $2,842,182.37 | *2009 Total* | **$9,085.40** |
| | $51,523,110.00 | $0.00 | $11,079,106.79 | $3,877.90 | $62,606,094.69 | $72,470.22 | $62,533,624.47 | | $ 72,470.22 |
| | | | | | | $0.00 | $0.00 | | |

SCHEDULE B

NetJets Large Aircraft, Inc., et al. v. United States, Case No. 2:11-cv-1023 (S.D. Ohio)

SCHEDULE B

**Federal Air Transportation Excise Tax -Form 720**
**Summary of Assessment and Divisible Taxes Paid**

| | Excise Tax Quarter | Tax Assessed | Penalty | Interest | Reduction of Int Prev Allowed | Total | Divisible Portion | Request for Abatement | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Executive Jet Management, Inc.** (EIN: 31-0913865) | | | | | | | | | | |
| | 200506 | $593,722.00 | | $237,117.71 | | $830,839.71 | $14,699.23 | $816,140.48 | | |
| | 200509 | $527,023.00 | | $256,879.39 | $2,374.41 | $786,276.80 | $15,989.88 | $770,286.92 | | |
| | 200512 | $580,598.00 | | $205,020.21 | | $785,618.21 | $16,836.86 | $768,781.35 | *2005 Total* | **$47,525.97** |
| | 200603 | $582,373.00 | | $189,927.68 | | $772,300.68 | $13,492.94 | $758,807.74 | | |
| | 200606 | $583,666.00 | | $178,514.24 | | $762,180.24 | $13,002.00 | $749,178.24 | | |
| | 200609 | $564,788.00 | | $158,019.17 | | $722,807.17 | $14,844.47 | $707,962.70 | | |
| | 200612 | $603,391.00 | | $153,406.15 | | $756,797.15 | $17,437.05 | $739,360.10 | *2006 Total* | **$58,776.46** |
| | 200703 | $488,141.00 | | $112,279.01 | | $600,420.01 | $18,468.92 | $581,951.09 | | |
| | 200706 | $508,246.00 | | $96,433.65 | $516.45 | $605,196.10 | $16,128.72 | $589,067.38 | | |
| | 200709 | $511,750.00 | | $92,831.78 | | $604,581.78 | $15,918.76 | $588,663.02 | | |
| | 200712 | $403,534.00 | | $64,090.08 | | $467,624.08 | $16,895.19 | $450,728.89 | *2007 Total* | **$67,411.59** |
| | 200803 | $601,286.00 | | $84,168.92 | | $685,454.92 | $17,051.28 | $668,403.64 | | |
| | 200806 | $688,651.00 | | $84,982.38 | | $773,633.38 | $15,603.17 | $758,030.21 | | |
| | 200809 | $741,742.00 | | $118,282.78 | $656.10 | $860,680.88 | $17,313.20 | $843,367.68 | | |
| | 200812 | $672,654.00 | | $59,959.10 | | $732,613.10 | $13,229.25 | $719,383.85 | *2008 Total* | **$63,196.91** |
| | 200903 | $414,571.00 | | $32,385.36 | $353.46 | $447,309.82 | $14,117.93 | $433,191.89 | | |
| | 200906 | $678,929.00 | | $46,617.78 | | $725,546.78 | $12,645.49 | $712,901.29 | *2009 Total* | **$26,763.42** |
| | | $9,745,065.00 | $0.00 | $2,170,915.39 | $3,900.42 | $11,919,880.81 | $263,674.35 | $11,656,206.46 | | $ 263,674.35 |
| | | | | | | | $0.00 | $0.00 | | |

SCHEDULE B