UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


NETJETS LARGE AIRCRAFT, INC., et al.,

      Plaintiffs,

                              Case No. 2:11-cv-1023
      v.                       JUDGE EDMUND A. SARGUS, JR.
                              Magistrate Judge Terence P. Kemp
UNITED STATES OF AMERICA,

      Defendant.

### OPINION AND ORDER

This matter is before the Court for consideration of the parties' cross-motions for summary judgment. (ECF Nos. 61, 62, 93, 103.) Three plaintiffs in this case are NetJets Aviation, Inc., NetJets Large Aircraft, Inc., and NetJets International, Inc. (collectively "NetJets"). NetJets operates a "fractional ownership program" through which it provides aircraft maintenance, support, and other services to persons who own either a fractional ownership interest or fractional leasehold interest in an aircraft. (Noe Decl. ¶ 4; ECF No. 61-1.) The fourth plaintiff is Executive Jet Management ("EJM"), a subsidiary of the same company as NetJets that provides similar services to owners of entire aircraft. (*Id.* ¶ 11.) The United States, the defendant and counterclaimant in this case, seeks to collect taxes on different fees that NetJets and EJM collects from its clients.

This opinion analyzes three legal questions presented in the summary judgment motions. First, the Court analyzes the United States' argument that NetJets lacks standing to bring a refund claim on the taxes it collected and remitted. Second, the Court turns to the parties' dispute over whether a particular provision of the federal tax code, 26 U.S.C. § 4261, applies to

NetJets and EJM. Section 4261 imposes a tax on the amount paid for "taxable transportation." 26 U.S.C. § 4261(a). Taxable transportation is defined as "transportation by air which begins in the United States or in the 225-mile zone and ends in the United States or in the 225-mile zone." 26 U.S.C. § 4262(a)(1). NetJets and EJM argue that they provide no "taxable transportation" while the United States maintains that they do. Third, the Court assesses NetJets' argument that, assuming § 4261 applies, a 1992 Technical Advice Memorandum ("1992 TAM") issued by the Internal Revenue Service bars the United States from collecting that tax on certain fees its customers pay. After these issues were fully briefed, the Court heard oral argument. These issues are now ripe for review.

For the reasons that follow, the United States' motion for summary judgment (ECF No. 103) on the issue of whether NetJets has standing to bring a refund claim is **DENIED**. The United States' motion for summary judgment (ECF No. 103) on the issue of whether NetJets provides taxable transportation under § 4261 is **GRANTED** and NetJets' motion for summary judgment on this issue (ECF No. 61) is **DENIED**. The United States' and EJM's motions for summary judgment (ECF Nos. 62 and 93) on the issue of whether EJM provides taxable transportation are **DENIED**. And, NetJets' motion for summary judgment (ECF No. 61) regarding whether the 1992 TAM bars the United States from collecting the § 4261 tax on certain fees is **GRANTED** and the United States' motion for summary judgment (ECF No. 103) on this issue is **DENIED**.

## I. STANDARDS

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment).

Here, the parties have filed cross-motions for summary judgment. Each party, as a movant for summary judgment, bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to a judgment as a matter of law. The fact that one party fails to

satisfy that burden on its own Rule 56 motion does not automatically indicate that the opposing party or parties has satisfied the burden and should be granted summary judgment on the other motion.  In reviewing cross-motions for summary judgment, courts should "evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party."  *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994).   "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record."  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *John v. State of La. (Bd. of Trs. for State Colls. & Univs.)*, 757 F.2d 698, 705 (5th Cir.1985)).  The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by one party to the litigation. *Taft Broad.*, 929 F.2d at 248.

**B. Burden of Proof**

The United States cites the burden of proof as belonging to NetJets and EJM as taxpayers. *See Lewis v. Reynolds*, 284 U.S. 281, 283 (1932); *see also Ekman v. C.I.R.*, 184 F.3d 522, 524 (6th Cir. 1999); *Sinder v. United States*, 655 F.2d 729, 731 (6th Cir. 1981) (per curiam).  But "the concept of 'burden of proof' has no relevance where a dispute is solely on a question of law." *Sequa Corp. & Affiliates v. United States*, 350 F. Supp. 2d 447, 449 (S.D.N.Y. 2004) *aff'd* 437 F.3d 236 (2d Cir. 2006).   And any doubt as to the breadth of the term "taxable transportation," "must be resolved against the government and in favor the taxpayer."  *See United States v. Merriam*, 263 U.S. 179, 187-88 (1923); *see also Bowers v. New York & Albany Lighterage Co.,* 273 U.S. 346, 350 (1927) ("The provision is part of a taxing statute; and such laws are to be interpreted liberally in favor of the taxpayers.").

4

## II. NETJETS

The Court begins by examining the claims involving NetJets. To provide context for these claims, the Court lays out the relevant factual background. Then, the Court assesses whether NetJets has standing to pursue a refund claim. Next, the Court examines whether NetJets offers "taxable transportation" under § 4261. And last, the Court turns to the argument that the 1992 TAM allows the IRS to collect the § 4261 tax on only the occupied hourly fee.

### A. The NetJets Program

NetJets' flight programs allow customers, or participants, to gain nearly on-demand use of airplanes in a fleet of airplanes and pilots. To participate, the customer pays NetJets an amount equal to the cost of a portion (as little as 1/16) of a single airplane, or pay the cost of a portion of a long-term lease of an airplane. In exchange, the participant receives title to or a leasehold interest in a fractional interest in an airplane.

Customers enter into several agreements with NetJets. Under the "Purchase Agreement," the customer receives an interest in the plane. Also in the agreement, NetJets retains the right to repurchase the aircraft interest after five years, or to repossess the interest in the event of default, such as not paying NetJets its fees. (Purchase Agreement ¶ 6(c); ECF No. 103-3.) The owner agrees not to transfer its interest to a non-affiliate without the program manager's consent. (*Id.* ¶ 7.)

Participants also enter into an "Owners Agreement," in which they agree to the terms of use for their jointly owned aircraft. In this document, the clients agree to an allotted number of hours that they may use the plane. (Noe Decl. ¶ 16; ECF No. 61-1.) If owners exceed their allotted number of hours, they are billed a different, higher rate. (Management Agreement at 11;

5

ECF 103-3.)  The participant also agrees that the aircraft will be used exclusively in the fractional ownership aircraft program.  (Owners Agreement ¶ 3; ECF No. 103-1.)

Under a separately signed "Management Agreement," participants give NetJets possession of the plane and the exclusive right to manage the aircraft.  (Management Agreement ¶ 1; ECF 103-3; Noe Decl. ¶ 16; ECF No. 61-1.)).  NetJets' responsibilities include arranging aircraft inspection and maintenance, maintaining records and other FAA-required materials, obtaining fuel for owners, arranging flights, and providing pilots and crew.  (Noe Decl. ¶ 17; ECF No. 61-1.)  Also under the Management Agreement, NetJets has the right to transfer the participant's interest in one aircraft to another aircraft of equal or greater value.  (Management Agreement ¶ 19; ECF 103-3.)  The Management Agreement also provides NetJets the right to use the aircraft if it is not in use by the participant.  NetJets uses the planes to provide charter air transportation to the public and to train its pilots.  (Management Agreement ¶ 7; ECF 103-3.)  Any money earned from these uses belongs to NetJets.  (*Id.*)

The fractional owner also enters a "Master Interchange Agreement" (also referred to as a "dry lease" agreement).  This agreement is designed to help cope with scheduling conflicts that arise when multiple fractional owners want to use the same aircraft at the same time by allowing a fractional owner to use a different plane from NetJets' fleet.  (Noe Decl. ¶ 19; ECF No. 61-1; Noe Dep. at 25-26; ECF No. 103-20.)  The agreement purports to make program participants "lessors of their respective Aircraft and as lessees of other Program Aircraft provided by other Participants in the Program on an equal time basis."  (Master Interchange Agreement ¶ 1; 103-1.)  If a plane under this agreement is unavailable, NetJets will arrange to charter for the owner a comparable type of aircraft outside of the fleet.  (Management Agreement ¶ 8; ECF 103-3.)

6

Thus, sometimes participants fly on planes that are not part of the Master Interchange Agreement.

In exchange for NetJets' services, participants pay three different fees. The first is a occupied hourly fee, which reflects a per hour flight fee and compensates NetJets for costs, such as fuel, associated with operating the aircraft. The second charge is called a monthly management fee. This is a fixed expense that covers costs associated with owning the aircraft, such as insurance and crew salaries. Owners must pay this fee regardless of whether, and how much, the aircraft is used. And the third fee that owners pay is a variable fuel surcharge if fuel prices rise above the agreed upon price in the management agreement. (Noe Decl. ¶ 17; ECF No. 61-1.)

**B. Procedural History**

In the 1990s, the Internal Revenue Service ("IRS") conducted an examination to determine the correct excise-tax liability of NetJets' predecessor, Executive Jet Aviation, Inc. (Strapp Dep. at 12; ECF No. 103-19.) During the examination, Executive Jet challenged the application of § 4261 to its fractional ownership aircraft program. The IRS issued a technical advice memorandum ("1992 TAM") that addressed whether § 4261 taxes "should be collected by [Executive Jet] on amounts paid to it by aircraft owners for air transportation." T.A.M. 93-14-002, 1992 WL 465951 (Dec. 22, 1992). The IRS applied a test developed by a series of revenue rulings that assessed the § 4261 tax on the entity providing transportation services if it had "possession, command, and control" of the aircraft. The IRS determined that,

> In viewing the totality of the circumstances, including the agreements and the respective responsibilities of the parties, although the owners are the title holders to the aircraft, they have relinquished possession, command, and control, of their respective aircraft to [Executive Jet] who provides air transportation. The owners are obligated upon the purchase of an interest in an aircraft to sign agreements that effectively allow [Executive Jet] to treat the . . . aircraft as part of

7

its charter fleet. [Executive Jet] supplies and has command over the pilots and, even though the owners may designate which pilots they prefer, [Executive Jet] has ultimate control over assignment of crews. [Executive Jet] is responsible for operations, maintenance, and insurance expenses, and, depending on the nonavailability of the aircraft, provides transportation to an owner in any aircraft in the . . . program or within [Executive Jet's] charter operation-thus in many instances transporting an owner in an aircraft in which it does not even have an ownership interest. Under the owners agreement, an owner generally cannot utilize a[] . . . program aircraft to transport passengers or cargo for compensation or hire. Therefore, [Executive Jet] is providing taxable air transportation of persons under section 4261(a) of the Code.

T.A.M. 93-14-002, 1992 WL 465951 (Dec. 22, 1992).

The IRS, after determining that Executive Jet provided taxable transportation, determined that the § 4261 tax "should be collected by the taxpayer on *amounts paid* to it by aircraft owners *for air transportation provided by the taxpayer*." *Id.* (emphasis added). The 1992 TAM does not specify which fees collected by Executive Jet were "amounts paid" for air transportation subject to § 4261.

After the 1992 TAM, Executive Jet discussed with the IRS which fees constituted "amounts paid to it by aircraft owners for air transportation." (Strapp Decl. ¶ 21; ECF No. 61-2.) Executive Jet sent a letter to the responsible IRS revenue agent proposing that only the occupied hourly fee—$1,060 per hour in 1993—be treated as an "amount paid" for transportation because that reflected the value of a particular flight. (Strapp Decl. ¶ 23; ECF No. 61-2.) To support this contention, Executive Jet provided the IRS with information showing that the occupied hourly fee was comparable to the rates being charged by charter companies for individual flights. (*Id.*)

According to Executive Jet, the IRS's National Office accepted this proposal and agreed that only the occupied hourly rate charge ($1,060 per hour) constituted an "amount paid for air transportation." (*Id.*). One Executive Jet officer, in in handwritten notes, maintained that the IRS's examiner said at a meeting that "[t]he $1060/hour has been agreed to by the National

8

Office." But, the notes continued, "no discussion came up about the appropriate rate per hour" as to new aircraft. (Cole Decl. Ex. 10 at 2; ECF No. 76-11.) According to the United States, most of the records concerning this examination no longer exist, and thus it is not known why the IRS limited the tax to only the occupied hourly fee. (United States Mot. Summ. J. at 23-24; ECF No. 103-1.) The IRS, however, offers no evidence that disputes NetJets' account of the agreement.

Executive Jet then began collecting and remitting the § 4261 tax on its occupied hourly fees, but not on the monthly management fee or the fuel variable surcharge. Executive Jet modified its monthly invoices to reflect the tax being imposed on the occupied hourly fee, and provided the IRS's revenue agent with copies of the new invoice forms. (Strapp Decl. ¶ 25.)

After collecting and remitting the tax on the occupied hourly fees, Executive Jet filed a claim for a refund. The IRS, after reviewing the refund claim, notified the company that the refund claim was disallowed and included a "Form 5385" that indicated that Executive Jet correctly collected and remitted the § 4261 tax. (Strapp Decl. ¶ 28; Strapp Ex. 11.)

NetJets then brought a refund suit in the Court of Federal Claims, arguing that § 4261 did not apply to its operations. During the course of litigation, the United States acknowledged its position that the § 4261 tax applied only to occupied hourly fees. For example, in its cross motion for summary judgment, the United States stated:

> [Executive Jet] proposed on the basis of data [Executive Jet] submitted to the IRS concerning comparable charter rates, that the Hourly Rate of $1,060 be used to compute the 10% F.E.T. ($106 per Hour) which would be computed on the number of hours actually flown per month by each NetJets owner. That hourly rate was accepted by the Internal Revenue Service as the rate upon which the F.E.T. would be calculated.

(Strapp Decl. ¶ 30 & Ex. 12 at pg. 10.)

9

The trial court ultimately held that Executive Jet had possession, command, and control of the aircraft and thus §4261 applied. *Executive Jet Aviation, Inc. v. United States*, No. 95-7T, slip op. at 22 (Fed. Cl. Mar. 29, 1996). The court questioned whether other payments that Executive Jet received should be subject to § 4261, but never addressed whether § 4261 applied to other fees, noting,

> The IRS agreed to base the tax on the hourly rate of only $1,060 on the basis of data submitted by EJA regarding comparable charter rates and apparently did not take into account the monthly management fee, or the value of the use of the planes by EJA. (It is unclear, however, why the IRS did not treat any part of the management fee, or the value of the airplanes provided for EJA's use or non-NetJets flights, as an amount paid for taxable transportation and thus subject for the § 4261 tax. Whether this stipulation is as to the historical agreement only, or whether it represents the government's current stipulation as to the proper measure of the tax is also unclear. Since no offset has been pleaded, the court assumes the latter is the case.)

> *Id.* at 5-6.

Executive Jet appealed, and the Federal Circuit affirmed. *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463 (Fed. Cir. 1997). Rather than applying an analysis that hinged on possession, command, and control, the appellate court looked to the tax code's different treatment of non-commercial flights, in which only gasoline and non-gasoline fuel taxes apply, and commercial aviation, in which only § 4261's air-transportation tax applied.[1] 125 F.3d at 1464. The Federal Circuit analyzed the various agreements that NetJets[2] entered into with customers and determined that the company was in "in a business of transporting persons or property for hire by air," and thus engaged in commercial transportation subject to § 4261. 125 F.3d at 1469 (citing 26 U.S.C. § 4041(c)). Like the trial court, the appellate court noted that the

---

[1] It is not apparent from the opinion why the Federal Circuit did not rely on the possession, command, and control test. The parties offer no explanation as to why the appellate court chose a different analysis from the trial court.

[2] Executive Jets was the aircraft management and air charter service company that operated "its 'NetJets' program." *Executive Jet*, 125 F.3d at 1465.

IRS computed the tax that was due based only on the occupied hourly fee, but did not address whether the tax should apply to other NetJets fees.  125 F.3d at 1467.

After *Executive Jet*, NetJets collected the § 4261 tax on the occupied hourly fee, but not on the monthly management fee or the fuel variable surcharge.  According to NetJets' tax manager, when preparing the company's tax returns, NetJets "relied almost exclusively on the 1992 *Executive Jet Aviation* case" because it "seemed to be . . . directed to our program." (Burris Dep. at 70-71; ECF No. 103-22.)  Indeed, NetJets management viewed *Executive Jet* as "basically [their] Bible," concluding that "the case dictated . . . that the occupied hourly fee was subject to federal excise tax, and that was all that was subject to federal excise tax." (Burris Dep. at 27-29.)

The IRS issued another technical advice memorandum in 2004 relating to a fractional ownership aircraft program similar to NetJets'.  The TAM concluded that the monthly management fees and variable rate fees were subject to the § 4261 tax.  NetJets' tax manager said that he read the 2004 TAM by the end of that year and discussed it with his bosses.  (Burris Dep. at 43-46, 86-87; ECF No. 103-22.)  But NetJets did not start collecting § 4261 taxes on these fees, instead continuing to collect and remit the tax on only the occupied hourly fee. (Garvey Dep. at 39-40; ECF No. 103-21.)

In 2007, the IRS commenced another examination of NetJets' excise tax liability.  As a result of the examination, the IRS made retroactive assessments of taxes related to NetJets' non-collection of § 4261 taxes upon the management fees and fuel variable surcharges.  (Garvey Decl. ¶ 15; ECF No. 62-2.)  Moreover, because the assessments were retroactive, the IRS also assessed, and continues to assess, penalties and interest.  (*Id.* ¶ 16.)

Each NetJets entity paid a portion of the additional taxes and then filed a claim for refund for taxes paid on all three fees. (*See* United States Mot. Summ. J. at 31; ECF No. 103-1; *see also* NetJets' Mot. Summ. J. at 28; ECF No. 61.) NetJets' claim for refund totaled $219,540,056 plus interest, and its claim for abatement of the unpaid portions of the assessments against the monthly management fees and fuel variable surcharge totaled $339,697,080 plus interest. (NetJets' Mot. Summ. J. at 29; ECF No. 61.) The IRS asserted a counterclaim, seeking to collect the unpaid portions of its assessment against the monthly management fees and the fuel variable surcharge.

**C. Standing**

The United States maintains that NetJets lacks standing to pursue its claim for a refund of the § 4261 tax it collected and remitted on the occupied hourly fees because it has not yet satisfied the requirements of 26 U.S.C. § 6415(a). That section provides:

> Credit or refund of any overpayment of tax imposed by section 4251, 4261, or 4271 may be allowed to the person who collected the tax and paid it to the Secretary if such person establishes, under such regulations as the Secretary may prescribe, that he has repaid the amount of such tax to the person from whom he collected it, or obtains the consent of such person to the allowance of such credit or refund.

The United States asserts that NetJets lacks standing to bring its refund claim because it is undisputed that NetJets has not repaid the amount of the § 4261 taxes that it collected and has not obtained consent from its customers.

The Court disagrees that these requirements must be satisfied before initiating a case. First, § 6415(a) does not specify *when* it must be satisfied, and "[o]n its face, the [statute] neither requires nor prohibits including the certification at the time of filing." *Chicago Milwaukee Corp. v. United States*, 40 F.3d 373, 375 (Fed. Cir. 1994) (interpreting similar regulation). Also, requiring NetJets to repay its customers the tax collected or obtain customer consent prior to

12

initiating a case "imposes a harsh burden without good reason." *Id.* at 377. The statutory requirement prevents a company from reaping a windfall by recovering taxes already passed on to its customers, and thus compliance at any time before the refund issues meets this purpose. *Id.* at 375-76 (citing *IBM v. United States*, 343 F.2d 914, 918 (Ct. Cl. 1965)). Moreover, there is good reason to not impose an earlier deadline: requiring certification of repayment or consent when a taxpayer files a refund claim imposes a heavy burden and discourages pursuit of an uncertain refund. *Id.* at 375. Thus, the Court agrees with those courts that require certification prior to any issuance of a refund, and not before the commencement of a lawsuit. *See id.* at 377 (holding certification required before recovery of refund, not before lawsuit); *see IBM*, 343 F.2d 917-18 (holding similar statute did not condition plaintiff's right to sue); *cf. Trans-Lux Corp. v. United States*, No. 123-79T, 1982 WL 11262, at *1 n.4 (Ct. Cl. Mar. 9, 1982) ("Defendant's position is . . . only that should the court decide in favor of plaintiff, 'no damages can be awarded until plaintiff provides proof' of either repayment of the excise taxes involved to its lessees or obtains 'their written consents' to plaintiff's recovery of those amounts.").

The United States' position does not persuade otherwise. The two non-binding cases that the United States offers to support its position that § 6415 must have been already satisfied did not address whether consent needed to be obtained before filing a lawsuit or before recovery. *See, e.g.*, *McGowan v. United States*, 296 F.2d 252, 254-55 (5th Cir. 1961) (plaintiff claimed to have standing because it had "borne the economic burden" of the tax itself); *cf. IBM*, 343 F.2d at 918 (determining that *McGowan* "held no more . . . than that a taxpayer's *ultimate recovery is conditioned* upon persuading the judge that he has absorbed the tax or secured the necessary consents") (emphasis added). And the Court notes that the United States has apparently changed its position on § 6415(a) during this litigation. In the parties' Rule 26(f) Report, the United

States agreed "that the statutory requirements of Section 6415 . . . must be met before any overpayment credits could be issued."  (Rule 26(f) Report of the Parties ¶ 4a; ECF No. 35); *cf.* Rev. Rul. 69-508, 1969-2 C.B. 262 (1969) ("It is held that the alternative requirements set forth in section 6415(a) of the Code are not conditions precedent to the timely filing of a claim.").

Thus, the Court finds that § 6415 presents no obstacle at this stage in the ligation.

**D. The Taxable Transportation Analysis**

NetJets argues that it owes no tax under § 4261 because it does not provide "taxable transportation."  The United States contends that this issue was already resolved in *Executive Jet Aviation, Inc. v. United States*, 125 F.3d 1463 (Fed. Cir. 1997).  That decision held that Executive Jet—NetJets' predecessor—must collect and remit § 4261 taxes on its base hourly charge.  There, the Federal Circuit examined the "sole issue" of whether "the flights which [Executive Jet] conducted . . . constituted 'taxable transportation' for hire by air under IRC § 4261."  125 F.3d at 1467.  In resolving this issue, the appellate court looked to the tax code's different treatment of commercial aviation and non-commercial aviation.  While commercial aviation was subject to only to the § 4261 transportation tax, non-commercial transportation was subject to only fuel taxes found in 26 U.S.C. § 4041(c).  *See* 125 F.3d at 1464-65.  The court turned to § 4041(c), the "critical provision," which determined whether the non-commercial fuel tax applied.  That section defined commercial aviation (as an exception to non-commercial travel) as "any use of an aircraft . . . in a business or transportation of persons or property for compensation or hire by air."  125 F.3d at 1468.  In determining whether Executive Jet provided such use, the court looked to the company's agreements with its clients and determined that: NetJets was more than an aircraft manager, any ownership by program participants was "highly circumscribed," and there were "negligible differences between the NetJets aircraft interchange

program and the operation of a commercial air charter business." *Id.* at 1469. Thus, the Federal

Circuit concluded that NetJets offered commercial aviation subject to § 4261. *Id.*

In light of this case, the United States maintains that collateral estoppel and res judicata

bar NetJets' position that it does not offer taxable transportation. The Court first analyzes the

United States' collateral estoppel argument and, finding that it applies, does not weigh in on the

res judicata argument.

Collateral estoppel, or issue preclusion, "bars subsequent relitigation of a fact or issue

where that fact or issue was necessarily adjudicated in a prior cause of action and the same fact

or issue is presented in a subsequent suit." *Cobbins v. Tennessee Dep't of Transp.*, 566 F.3d 582,

589 (6th Cir. 2009). It "prevents relitigation of issues and relieve[s] the government and the

taxpayer of redundant litigation of the identical question of the statute's application to the

taxpayer's status." *Disabled Am. Veterans v. C.I.R.*, 942 F.2d 309, 312-13 (6th Cir. 1991)

(internal quotation marks omitted). For collateral estoppel to bar litigating an issue, the United

States must show that: "(1) the precise issue [was] raised and actually litigated in the prior

proceedings; (2) the determination of the issue [was] necessary to the outcome of the prior

proceedings; (3) the prior proceedings . . . resulted in a final judgment on the merits; and (4) the

party against whom estoppel is sought . . . had a full and fair opportunity to litigate the issue in

the prior proceeding." *Cobbins*, 566 F.3d at 589-90 (emphasis removed).

The Court finds that the United States has shown these elements to be met. Indeed,

NetJets offers no argument regarding whether the United States has made this showing. Here,

NetJets raises the same issue litigated in *Executive Jet*—whether it provides taxable

transportation under § 4261. *See Disabled Am. Veterans*, 942 F.2d at 312 (barring party from

relitigating the issue of "whether the payments [the party] received are [not taxable as]

'royalties'"). In *Executive Jet*, resolving this issue was necessary—indeed dispositive—to the outcome and the Federal Circuit rendered a final decision on the merits. Nothing in the record indicates that Executive Jet did not have a full and fair opportunity to litigate the issue before the Federal Circuit, and NetJets stands in privity with Executive Jet, its predecessor. (*See* NetJets' Mot. Summ. J. at 4; ECF No. 61 (describing Executive Jet Aviation, Inc. as "NetJets' predecessor"); *see also* Strapp Dep. at 12; ECF No. 103-19.)  *See Taylor v. Sturgell*, 553 U.S. 880, 894 (2008) ("[N]onparty preclusion may be justified based on a variety of pre-existing substantive legal relationship[s] between the person to be bound and a party to the judgment. . . . includ[ing], but . . . not limited to, preceding and succeeding owners of property.") (internal citations omitted); *see also Alb, Inc. v. Noma Lites, Inc.*, 231 F.2d 662, 663 (2d Cir. 1956) (per curiam) (holding collateral estoppel barred claim against company that was a spun off subsidiary of the earlier prevailing parent company).

NetJets nevertheless asserts that it may relitigate whether it provides taxable transportation, arguing that the Federal Aviation Administration's ("FAA") promulgation of certain rules in 2003 changed the "controlling facts" and "applicable legal rules" since *Executive Jet*.  The Supreme Court has held that collateral estoppel "must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." *C.I.R. v. Sunnen*, 333 U.S. 591, 599-600 (1948).

NetJets believes that *Executive Jet*'s holding was "eviscerated" by the FAA's promulgation of safety rules in a set of Federal Aviation Regulations ("FARs"). *See* 14 C.F.R. § 91.1001-91.1443.  Contrary to the Federal Circuit's finding of NetJets as essentially a commercial charter business, NetJets presses that the FARs establish it as a "fractional

ownership program manager" that provides "administrative and aviation support services."  14
C.F.R. § 91.1001(b)(8)-(9).  Also, NetJets maintains that *Executive Jet*'s conclusion that NetJets
engages in commercial activity can no longer stand because the FARs purportedly prohibit
fractional program flights from being conducted "for compensation or hire."  *Id.* § 91.1005(a);
*see also* 26 U.S.C. § 4083(b) (defining "commercial aviation" as "use of an aircraft in a business
of transporting persons or property for compensation or hire by air").

   The Court concludes that the FARs do not disturb *Executive Jet* and thus that decision
remains binding on NetJets.  The Federal Circuit never relied on any of the then-existing FARs
in reaching its conclusion that the fractional ownership program constituted taxable
transportation.  Rather, it focused on the operative contracts establishing: NetJets as more than an
aircraft manager, the "highly fettered" ownership interests of participants, and the "negligible
differences between" NetJets and a commercial air charter business.  125 F.3d at 1469.  The
FAA changing the FARs does not alter any of the contractual restrictions, and the operative
agreements then and now are substantially the same.  (*See* United States Mot. Summ. J. at 41;
ECF No. 103-1; *see also* NetJets' Resp. Mot. Summ. J. at 21 n.5; ECF No. 104.)  *See Disabled
Am. Veterans v. C.I.R.*, 942 F.2d 309, 313 (6th Cir. 1991) ("The Supreme Court elaborated in
*Montana v. United States*, 440 U.S. 147, 161 (1979), . . . that collateral estoppel operate[s]
'unless there have been major changes in the law[.]'"); *cf. id.* at 313 (rejecting argument that
administrative ruling sufficiently changed the legal climate rendering preceding case no longer
binding, noting that in the cases where such change has been found, the "administrative change
was an *express* overruling of a prior position").

   NetJets' contracts have not changed since *Executive Jet*.  Likewise, the legal framework
upon which the Federal Circuit relied has remained the same.  The appellate court relied on the

tax code's different treatment of commercial and non-commercial transportation, a distinction that continued during the tax periods at issue here.  Those who engage in commercial transportation are still subject to § 4261, and commercial aviation is still defined under the fuel-excise-tax provisions as "any use of an aircraft in a business of transporting persons for compensation or hire by air."  26 U.S.C. § 4083(b).

NetJets insists that the FARs are relevant here.  At oral argument, it asserted that "the Supreme Court has made it clear that even in tax cases you look to the . . . substantive law that binds the transaction to define the nature of the transaction," analogizing this case to a tax dispute over a contract in which courts look to the treatment under state law to determine how it should be treated for tax purposes.  (Transcript at 23-24; ECF No. 129.)  Though NetJets offered no citation for this proposition, resorting to state law on a contract dispute is not surprising as "contract interpretation is generally a matter of state law."  *BellSouth Telecommunications, Inc. v. Goss*, 142 F. App'x 886, 888 (6th Cir. 2005).  But here, critically, NetJets offers no authority—and the Court knows of known—to support the contention that the FARs—which are *safety regulations*—are "controlling" or "applicable" in a *tax dispute*.  *Cf.* Regulation of Fractional Aircraft Ownership Programs and On-Demand Operations, 68 FR 54520-01, 54521 (summarizing final rulemaking as "establish[ing] *safety standards* to *maintain the safety record* of current fractional ownership programs and to ensure that new fractional ownership programs will also meet a high level of *safety*") (emphasis added).  And, "one agency's interpretation of a congressional statute is 'not controlling' on another agency's interpretation of that same statute."  *See Am. Bar Ass'n v. F.T.C.*, 671 F. Supp. 2d 64, 81 (D.D.C. 2009) *vacated and remanded on other grounds,* 636 F.3d 641 (D.C. Cir. 2011) (citation omitted); *see also Old Colony R. Co. v.*

*Comm'r of Internal Revenue*, 284 U.S. 552, 562 (1932) (holding that the rules of accounting enforced by the Interstate Commerce Commission are not binding upon the IRS).

Indeed, neither the IRS's nor the FAA's interpretation of FAA safety regulations supports NetJets' contention. The IRS has long considered its application of the tax code independent from the FAA's safety rules. In 1978—well before this dispute—the IRS issued a revenue ruling stating that "[t]he status of an aircraft operator as a 'commercial operator' under [FAA] regulations is not determinative in applying the aviation fuel and transportation taxes imposed by section[] . . . 4261 . . . of the Code." *See* Rev. Rul. 78-75, 1978-1 C.B. 340, 1978 WL 42060 (1978). Likewise, in promulgating the 2003 FARs at issue here, the FAA recognized *Executive Jet*'s holding that "fractional ownership programs are commercial operations for *tax purposes*," but announced that "[t]ax law does not govern *safety rules*. The FAA considers fractional ownership programs private operations *for safety and operational control purposes*." Regulation of Fractional Aircraft Ownership Programs and On-Demand Operations, 68 Fed. Reg. 54,520, 54,523 (Sept. 17, 2003) (emphasis added). Thus, even in promulgating the very regulations that NetJets relies upon, the FAA did not claim to change how the tax law applies.

Cementing the conclusion that the FARs did not change the application of the tax code, Congress amended 26 U.S.C. § 4261 in 2012 to temporarily exclude fractional ownership programs. FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 1103(c) 126 Stat 11, 151. For periods beginning April 1, 2012 and ending September 30, 2015, fractional ownership aircraft programs are not subject to § 4261 but instead a special fuel tax surcharge. *See* 26 U.S.C. §§ 4261(j), 4043. This action would be unnecessary if the FARs already took the NetJets program out of § 4261's reach indefinitely. Though NetJets highlights two comments in the amendment's legislative history stating that the amendment was designed to "clarify[] and

reaffirm that fractional aviation is non-commercial aviation," *see* 158 Cong. Rec. H445-04, H456, the statutory text unambiguously applies the amendment prospectively and for a limited time—not retroactively to cover the time period at issue here.

Thus, the Court concludes that NetJets provides taxable transportation.

**E. The 1992 TAM**

Because NetJets provides "taxable transportation" under § 4261, the Court moves on to the next inquiry:  whether the IRS may collect this tax on all of NetJets' fees or only one of them.  NetJets maintains that it owes the tax on only its occupied hourly fee because the IRS declared its position in the "1992 TAM that *only* the occupied hourly fee is an 'amount paid' for taxable transportation," and never followed the necessary procedures to revoke this holding before making the retroactive assessment here.  Not so, says the United States; rather, the 1992 TAM "unambiguous[ly]" applies the § 4261 tax to all fees collected by NetJets.

The 1992 TAM expressly held that the § 4261 tax "should be collected by the taxpayer on amounts paid to it by aircraft owners for air transportation provided by the taxpayer."  T.A.M. 93-14-002, 1992 WL 465951.  Though the 1992 TAM recognized that program participants paid an hourly rate (that is "adjusted to reflect fluctuations in fuel costs") and a monthly management fee, it never expressly identified what fees qualify as an "amount paid . . . for air transportation."

But a mountain of *undisputed* evidence shows that the 1992 TAM applies the § 4261 tax to only the occupied hourly fee.  After receiving a copy of the 1992 TAM, Executive Jet promptly contacted the IRS for clarification as to what fees constituted "amounts paid . . . for air transportation."  (Strapp Decl. ¶¶ 21-22.)  Executive Jet proposed that only the occupied hourly fee, which was $1,060 per hour in 1993, be subject to the tax.  (*Id.* ¶ 23; Strapp. Ex. 7.) According to Executive Jet—and not disputed with any evidence by the United States—the

20

IRS's National Office accepted this proposal and agreed that only the occupied hourly rate charge ($1,060 per hour) constituted an "amount paid for air transportation." (Strapp Decl. ¶ 23.)[3]  Indeed, an Executive Jet officer, in handwritten notes, maintained that the IRS's examiner said at a meeting that "[t]he $1060/hour has been agreed to by the National Office." (Cole Decl. Ex. 10 at 2; ECF No. 76-11.)

Then, Executive Jet collected and remitted the § 4261 tax on its occupied hourly fees, but not on the monthly management fee or the fuel variable surcharge.  The company modified its monthly invoices to reflect the tax being imposed on the occupied hourly fee, and provided the IRS's revenue agent with copies of the new invoice forms. (Strapp Decl. ¶ 25.)

After collecting and remitting the tax on the occupied hourly fees for the second and third quarters of 1993, Executive Jet submitted its quarterly excise tax return showing the amount of tax paid. (Strapp Decl. ¶ 26; Strapp Ex. 9.)  The IRS subsequently provided the company a "Form 5385" stating that the taxes collected on the occupied hourly fees was the "correct liability" under § 4261. (Strapp Decl. ¶ 28; Strapp Ex. 11.)  And in the Court of Federal Claims, the United States acknowledged that the hourly rate proposed by Executive Jet "was accepted by the Internal Revenue Service as the rate upon which the [tax] would be calculated." (Strapp Decl. ¶ 30 & Ex. 12 at pg. 10.)  Indeed, that court assumed that taxing the hourly rate and declining to take into account the monthly management fee "represent[ed] the government's current stipulation as to the proper measure of the tax." *Executive Jet*, No. 95-7T, slip op. at 5-6. And the Federal Circuit, in affirming the Court of Claims, noted that the "IRS computed the tax . . . based upon the hourly rate of $1060 . . . for each hour of flight time" and that "[n]o

---

[3] According to the United States, most of the records concerning this examination no longer exist, and thus it is not known why the IRS limited the tax to only the occupied hourly fee. (United States Mot. Summ. J. at 23-24; ECF No. 103-1.)

transportation tax was assessed with respect to the monthly fee." *Executive Jet*, 125 F.3d at 1467.

Under these circumstances—and with the application of § 4261 to only the occupied hourly fees consistent with the 1992 TAM's express language—there is no genuine issue that the 1992 TAM limits the application of § 4261 to only the occupied hourly fee.

NetJets argues that by applying § 4261 retroactively in a manner inconsistent with the 1992 TAM, the IRS violated its own regulations and procedures. *See Auto. Club of Mich. v. CIR*, 353 U.S. 180, 184 (1957) (holding IRS cannot abuse its discretion by giving retroactive effect to a change in a ruling). Specifically, NetJets points to two procedures that limit the IRS's ability to retroactively revoke a TAM. The Secretary promulgated Treasury Regulation 601.105, which states:

> [A] holding in a technical advice memorandum that modifies or revokes a holding in a prior technical advice memorandum will also be applied retroactively, with one exception. If the new holding is *less favorable* to the taxpayer, it will *generally not be applied to the period in which the taxpayer relied on the prior holding* in situations involving continuing transactions of the type described in §§ 601.201(l)(7) and 601.201(l)(8).

> 26 C.F.R. § 601.105(b)(2)(viii) (emphasis added).

Similarly, the IRS adopted Revenue Procedure 2,[4] which provides that:

> If an issue addressed in the TAM relates to a continuing action or a series of actions, *it is generally applied until it is withdrawn* or until the conclusion is *modified or revoked* . . . . If a new holding in a TAM is less favorable to the taxpayer than the holding in an earlier TAM, the *new holding is generally not applied to the period* when the taxpayer *relied on the earlier holding*. It will be applied to that period, however, if material facts on which the earlier TAM was based have changed.

> Rev. Proc. 2014-2, § 13.03, 2014-1 I.R.B. 90 (2014) (emphasis added).

---

[4] An IRS Revenue procedure is "a statement of procedure that affects the rights or duties of taxpayers or other members of the public under the [Internal Revenue] Code and related statutes . . ." 26 U.S.C. § 601.601(d)(2)(i)(b).

22

These two procedures show that a taxpayer that is subject to a particular TAM is entitled to rely on the IRS's position in the TAM until that holding is withdrawn, revoked, or modified. And, in the event a TAM is revoked or modified in a manner less favorable to a taxpayer, the new holding cannot be applied retroactively to the taxpayer unless the material facts on which the original TAM was based have changed.

As laid out by these IRS procedures, NetJets was entitled to rely on the 1992 TAM. And the company did so in good faith during the time period at issue. According to Revenue Procedure 2, that TAM should have been "applied until it is withdrawn or until the conclusion is modified or revoked by a final decision . . . ." Rev. Proc. 2014-2, § 13.03, 2014-1 I.R.B. 90 (2014). But to this day, the IRS has not modified, withdrawn, or revoked the 1992 TAM. Nevertheless, in January 2010, the agency expanded the tax retroactively to all of NetJets' fees.

Because these procedures were not followed while NetJets relied in good faith on the 1992 TAM, the Court concludes that the IRS could not retroactively assess the § 4261 tax to the management fee and variable fuel surcharge. *See Boggs v. C.I.R.*, 784 F.2d 1166, 1167 (4th Cir. 1986) (holding that the IRS abused its discretion by violating its own regulations when it retroactively revoked a tax-exemption ruling); *Lansons, Inc. v. C. I. R.*, 622 F.2d 774, 778 (5th Cir. 1980) ("We hold that when a taxpayer has put substantial good faith reliance upon an IRS determination of its tax position and when a retroactive revocation of that determination will produce an inordinate adverse effect, the Commissioner's failure to abide strictly by his own regulations limiting retroactive revocation of a favorable ruling amounts to an abuse of discretion.").

The United States highlights that these procedures target a "continuing action or series of actions" and argues that we do not have that here.  The Court disagrees.  The IRS's regulation provides an example of a "continuing transaction":

> [I]f a taxpayer rendered service or provided a facility which is subject to the excise tax on services or facilities, and in reliance on a ruling issued to the same taxpayer did not pass the tax on to the user of the service or the facility, the Assistant Commissioner . . . ordinarily will restrict the retroactive application of the revocation or modification of the ruling.

26 C.F.R. § 601.201(l)(7).

Like the IRS's example, NetJets renders a service that is subject to the excise tax and it relied on the 1992 TAM in not passing the § 4261 tax on to its customers.  The collection and remittance of the § 4261 tax regularly recurs, quarter after quarter, year after year.

Indeed, similarly recurring tax events have been regarded as continuing actions or transactions.  *See* T.A.M. 9808001, 1998 WL 67948 (Sept. 22, 1997) (concluding that employment tax withholding constituted a "continuing transaction"); *see also* T.A.M. 9519001, 1995 WL 280549 (Jan. 27, 1995) (concluding that IRS determination letter, which held that a taxpayer's employees were statutory employees, involved a "continuing action or series of actions," because the letter "gave rise to additional, independent transactions, which were the immediate consequences of the rulings").  And even the United States' sole authority for its position, a private letter ruling, recognized the "concept" that a continuing action or series of actions "may extend to routine transactions that are technically independent but fall into the same class and regularly recur."  P.L.R. 200116032 (Apr. 20, 2001).  Thus, the Court concludes that Revenue Procedure 2 and Treasury Regulation 601.105 apply.

The United States also argues that NetJets cannot estop the government from correcting its earlier mistake in not "fully implement[ing]" the 1992 TAM.  No doubt the IRS may

retroactively change an earlier interpretation of law, even when a taxpayer relied on that earlier interpretation to his detriment. *See Dickman v. C.I.R.*, 465 U.S. 330, 343 (1984). But courts repeatedly have held that the IRS must follow its own procedural rules in doing so. *See, e.g.*, *Boggs*, 784 F.2d at 1167; *Democratic Leadership Council, Inc. v. United States*, 542 F. Supp. 2d 63, 73, 75 (D.D.C. 2008) (collecting cases where IRS abused its discretion by violating its own procedures when retroactively assessing taxes and holding the same); *Phillies v. United States*, 153 F. Supp. 2d 612, 617 (E.D. Pa. 2001) (allowing refund where conditions required for retroactive revocation of private letter ruling were absent). And, the IRS did not follow the applicable procedures here.

Last, the United States questions whether the occupied hourly rate still reflects the cost to charter a plane, as it apparently did back in the 1990s, citing the increased amount owed by customers for the variable fuel surcharge and the different types of planes used by NetJets. If the IRS feels short changed because the occupied hourly rate no longer accurately accounts for the cost of a flight, then it may change the way in which it collects taxes. But if it wants to apply the tax retroactively, then it must follow its own procedures. It did not do so here, and thus the 1992 TAM limits the IRS to collecting the § 4261 tax on only the occupied hourly fees.

### IV. Executive Jet Management

Last, the Court analyzes Executive Jet Management's ("EJM") claim that it does not offer "taxable transportation" under § 4261. The United States advances no preclusion argument with respect to EJM because *Executive Jet* dealt with fractional ownership programs, not an aircraft management business that provided services to owners of the whole aircraft. Instead, the United States argues that the § 4261 tax is owed because EJM retains possession, command, and control

of the owners' aircraft when the planes are used in EJM's charter fleet. Before addressing the parties' arguments, the Court lays out the relevant factual background of the EJM program.

**A. The Executive Jet Management Program**

EJM is a wholly owned subsidiary of NetJets, Inc. and operates an aircraft management business in which it provides aviation services to owners of a whole aircraft. (Noe Suppl. Decl. ¶¶ 2-3; ECF No. 105-1.) EJM also operates a commercial air charter business, selling charter flights to the general public. (*Id.* ¶ 4.) Owners choose whether or not EJM can use their aircraft as part of the company's charter service for third-party customers. The United States has not assessed the § 4261 tax on fees paid by owners who did not place their aircraft in EJM's charter service, and thus the Court analyzes only whether EJM is responsible for fees received from customers who did place their planes in the charter service.

An aircraft owner contracting with EJM enters into an "Aircraft Management Agreement," which, coupled with other contracts, serves three purposes. First, it obligates EJM to provide certain services. Participants select the services they want from EJM on an a la carte basis in the management contracts that they enter. (Noe Suppl. Decl. ¶ 5; ECF No. 105-1.) In some instances, EJM provides services that are needed to keep the plane airworthy and ready to fly at all times. (*See, e.g.*, Aircraft Management Agreement § 2; ECF No. 93-3; *see also id.* § 7 (listing services that EJM is obligated to provide)). A management agreement in the record states that EJM "shall provide" the following services: a) establish safe operational capabilities for the aircraft and crew; b) review conformance of the aircraft operations with applicable aeronautics authorities' regulations and with the capabilities established for the aircraft; c) maintain current flight manuals, aircraft manuals, airway charges, and other documents and materials required to support the customer's flight operations; d) provide a system for flight

26

scheduling by the customer, recording and coordinating trip requests; e) obtain information on flight and weather conditions that might affect a flight; f) establish procedures for assuring that the aircraft is fully operational and that the aircraft and the flight crew are positioned for departure reasonably in advance of departure time; and g) maintain a detailed log of each trip made, passengers carried, and time en route. (Aircraft Management Agreement § 7; ECF No. 70-2.) Also, EJM, at the client's expense, arranges for the purchase of appropriate insurance for the aircraft. (*Id.* § 8.)

The Management Agreement can also task EJM with the responsibility of providing a pilot and crew. (*See* Aircraft Management Agreement §§ 6.1, 6.2; ECF No. 93-3.) But, crewmembers "serve at the Client's pleasure" and many owners already have their own flight crews and need no assistance from EJM. (Noe Suppl. Decl. ¶ 8; ECF No. 105-1.) Owners also can pilot their own planes provided they are appropriately licensed, and thus may not need a flight crew. (Noe Decl. ¶ 28; ECF No. 62-1.)

Second, the Management Agreement obligates EJM to use its best efforts to seek charter customers for the aircraft when it is not in use by the owner. (Aircraft Management Agreement § 3.1; ECF No. 62-1; *see also* Aircraft Charter and Lease Agreement § 2; ECF No. 93-4.) But, EJM must notify the owner of any proposed charter and obtain the owner's consent. (Aircraft Charter and Lease Agreement § 3.1; ECF No. 93-4.) If there is no response by the owner within eight hours, the proposed charter is considered rejected. (*Id.*) This allows the client to determine whether it needs to use the plane during the time of the charter. If so, EJM can then use another plane in the fleet for the charter. EJM "retain[s] sole authority for invoicing all" of the charter customers and is "solely responsible" for "billing and obtaining payment from all Aircraft charter customers." (*Id.* §§ 3.2(c), 3.3.) EJM and the owner split the charter business's revenue.

And third, the Management Agreement grants the owner access to fly on other aircraft in the fleet at a discounted rate. (Aircraft Management Agreement § 3.3; ECF No. 93-3.) Thus, the "[c]lient may charter other available aircraft under EJM[] . . . at a discounted hourly flight charge." (Aircraft Management Agreement §3.6; ECF No. 62-1.)

To compensate EJM for its services, clients pay a monthly management fee that covers the company's overhead and administrative charges. (Noe Suppl. Decl. ¶ 9; ECF No. 105-1.) Also, EJM bills its clients on a monthly basis for all the fixed and variable costs incurred in storing, maintaining, and operating the aircraft, including hangar costs, pilot salaries and benefits, and fuel. (*Id.*) EJM calls these "pass-through costs." (*Id.*)

In January 2010, the IRS assessed the § 4261 tax against the pass-through costs and the monthly management fees that clients paid EJM for the tax periods April 1, 2005 through June 30, 2009. The IRS drew a distinction between owners who put their aircraft in EJM's charter business, and owners who did not. EJM was liable only for its clients who entered their planes into the charter business, according to the IRS. Though EJM did not collect any § 4261 taxes from aircraft owners, it did collect and remit § 4261 taxes on all of the charter flights with third parties. Thus, the assessment at issue here relates only to payments received from owners who chose to make their aircraft available for use in EJM's charter program. The § 4261 tax for the relevant periods totals more than $9.7 million. (Garvey Decl. ¶ 15; ECF No. 62-2.)

**B. The Taxable Transportation Analysis**

Through a series of revenue rulings, the IRS has a developed a test for determining whether an entity provides commercial transportation triggering § 4261, or whether an entity is merely assisting the owner of the means of transportation, in which case the owner is engaged in non-commercial transportation and § 4261 does not apply. The IRS has ruled that if an entity,

other than the entity being transported, has "possession, command, and control" of the means of transportation and charges for its use, that entity is providing taxable transportation within the meaning of § 4261. *See* Rev. Rul. 60-311, 1960-2 C.B. 341, 1960 WL 12965 (1960); *see also* Rev. Rul. 76-394, 1976-2 C.B. 355, 1976 WL 36862 (1976).

As a threshold matter, EJM asserts that this test lacks validity because it "has no legal foundation in either the text or legislative history of section 4261." (EJM Resp. Mot. Summ. J. at 10; ECF No. 105.) But the test derives from the IRS's revenue rulings, and appropriate revenue rulings "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944); *see also Ammex, Inc. v. United States*, 367 F.3d 530, 535 (6th Cir. 2004) (holding that a revenue ruling "ha[d] the power to persuade and should be followed"). The weight accorded to revenue rulings "depend[s] upon the thoroughness evident in [their] consideration, the validity of [their] reasoning, [their] consistency with earlier and later pronouncements, and all those factors which give [them] power to persuade, if lacking power to control." *Ammex*, 367 F.3d at 535.

Consideration of these factors shows that deference is due to the possession, command, and control test. "[T]he IRS possesses relative expertness in the application of the [tax] Code to particular facts, given the technical complexity of federal tax law." *Id.* (internal quotation marks omitted). Also, the IRS has employed this test for over fifty years, *see Executive Jet Aviation, Inc. v. United States*, No. 95-7T, slip op. at 14 (Ct. Fed. Cl. March 29, 1996), and courts have respected it in the meantime, *see id.* (applying the test); *see also Shell Oil Co. v. United States,* 607 F.2d 924, 929 (Ct. Cl. 1979) (finding test entitled to "some weight"). Last, EJM identifies no infirmity in this longstanding and sensible application of § 4261, and the Court discerns none.

Next, EJM asserts that the test does not apply to the facts here.  Pointing to Revenue Ruling 60-311, EJM argues that the possession, command, and control test is aimed at determining whether an owner is *providing* taxable transportation, not *receiving* taxable transportation.  (*See* Transcript at 27-28; ECF No. 129.)  But the Court finds this argument unpersuasive.  There, the IRS simply applied the test to the facts before it:  a helicopter rental company that leased helicopters to an oil company but retained control of the vehicle.  Rev. Rul. 60-311, 1960-2 C.B. 341, 1960 WL 12965, at *2.  The ruling nowhere states that the analysis would not apply if an owner paid someone else to take possession, command, and control of the aircraft.  And, the IRS in Revenue Ruling 74-123 employed a similar analysis where an aircraft owner received transportation from an aviation company.  1974-1 C.B. 318, 1974 WL 34732, at *2.

At oral argument, EJM contended that Revenue Ruling 74-123 lacked "any type of logical and reasoned analysis of possession, command and control."  (Transcript at 75; ECF No. 129.)  True, that ruling does not use the phrase "possession, command, and control."  But the Court finds this of no consequence.  The substance of the revenue ruling's analysis mirrored that in Revenue Ruling 60-311.  That is, the IRS looked to the services offered by the aviation company in determining that those services offered amounted to taxable transportation. *Compare* Rev. Rul. 60-311, 1960-2 C.B. 341, 1960 WL 12965, at *1-2 (1960) (focusing on the helicopter rental company "perform[ing] all services in connection with the operation of the helicopters"), *with* Rev. Rul. 74-123, 1974-1 C.B. 318, 1974 WL 34732, at *2 (1974) (concluding that aircraft ownership "is not sufficient to change the *nature of the service* as 'taxable transportation'") (emphasis added).  And it was apparent in Revenue Ruling 74-123 that "[w]hen the company use[d] its own aircraft under the circumstances of this case, amounts paid

30

for the service rendered [we]re clearly subject to the tax."  Rev. Rul. 74-123, 1974-1 C.B. 318, 1974 WL 34732, at *2.  The ruling then went on to analyze "[t]he question presented," which was "whether the amounts paid for service when the company uses [client]-owned aircraft [we]re subject to the tax." *Id.*

EJM presses that even if the possession, command, and control test applies, Revenue Ruling 58-215 controls the Court's analysis here.  In that ruling, the IRS determined that § 4261 did not apply when an airline company operated a plane as an agent for a corporation to transport corporation personnel, and the corporation owned the aircraft, had exclusive control over aircraft personnel, paid the plane's operating expenses, and maintained insurance.  Rev. Rul. 58-215, 1958-1 C.B. 439, 1958 WL 10832, at *1-2 (1958).  While this arrangement between the airline company and the customer are somewhat similar to the issues in this case, there is one crucial difference: the company's use of the plane.  There, the airline company acted solely as the corporation's agent—and thus used the plane solely for the corporation—as the corporation purchased the plane to "transport[] its own personnel" and to use it as a "flying-office car." *Id.* at *1.  Here, by contrast, the airline company uses clients' planes as part of its charter business.  To operate this charter business, EJM must ensure that the aircraft is ready at all times for commercial air travel, through proper maintenance of the plane and the hiring of a crew.  And, the customer may not even fly on its own plane, but on another plane from EJM's fleet.  Thus, the nature of EJM's possession, command, and control of the planes differs from the airline company's in Revenue Ruling 58-215. *See* Rev. Rul. 60-311, 1960-2 C.B. 341, 1960 WL 12965, at *2 (1960) (citing Rev. Rul. 58-215 as an example of a vehicle owner "transfer[ring] the complete possession, command, and control" of the vehicle such that "the owner is not engaging in a taxable transportation service but is merely leasing his vehicle").

EJM contends that the Court must look to see who has possession, command, and control of the aircraft only while it is in flight. Because owners can decide important details such as where, when, and the route to fly, EJM contends that the owners have the relevant possession, command, and control of their planes such that the program manager does not provide taxable transportation. But this frames the inquiry too narrowly, as prior IRS Revenue Rulings look at the arrangement between the airline company and the client beyond the flight time. For example, Revenue Ruling 58-215 described how the customer entered into an agreement that "appointed the airline company its agent to service, maintain, overhaul, *and* operate the aircraft." Rev. Rul. 58-215, 1958-1 C.B. 439, 1958 WL 10832, at *1 (1958) (emphasis added). Revenue Ruling 60-311 considered the fact that the company performed "all services in connection with the operation" of the aircraft, such as furnishing a mechanic, the mechanical parts, "and the services and facilities necessary to keep the helicopters in good operating condition." Rev. Rul. 60-311, 1960-2 C.B. 341, 1960 WL 12965, at *1-2 (1960). In Revenue Ruling 74-123, the IRS looked to services such as performing "the day-to-day maintenance, inspections, repairs, painting, tie down, storage, and protection" of the aircraft. Rev. Rul. 74-123, 1974-1 C.B. 318, 1974 WL 34732, at *1 (1974). And in Revenue Ruling 76-394, the IRS determined that the owner of the aircraft had "the essential elements of possession, command and control of the planes at all times, *irrespective of the fact that the other participating companies may direct the pilot as to destination and other details concerning actual flights when they are using the plane*." Rev. Rul. 76-394, 1976-2 C.B. 355, 1976 WL 36862, at *2 (1976) (emphasis added). Thus, the Court looks beyond only the flight time in determining who has possession, command, and control of the aircraft.

Because no single Revenue Ruling answers the taxable transportation question here, the Court looks to other factors identified in subsequent revenue rulings that shed light on whether EJM has possession, command, and control such that § 4261 is appropriate.  As explained below, the record reveals genuine issues such that the Court is unable to say as a matter of law whether or not EJM provides "taxable transportation" under 26 U.S.C. § 4261.

One such factor that the Court considers is who performs the services that allow the aircraft to be operational.  In Revenue Ruling 60-311, a helicopter rental company was subject to § 4261 where it leased helicopters to an oil company but "retain[ed] the elements of possession, command, and control."  Rev. Rul. 60-311, 1960-2 C.B. 341, 1960 WL 12965, at *2 (1960). Central to the IRS's holding was that the helicopter rental company agreed to "perform all services in connection with the operation of the helicopters."  *Id.* at *1-2.  Here, the record is undeveloped as to how important of a role EJM plays in rendering the aircraft operational for flight by the owner.  True, EJM offers critical services that are needed to keep the plane airworthy and ready to fly at all times.  But these services are not necessarily used by all clients. Some of EJM's clients choose to have EJM manage all aspects of their aircraft, whereas others select only a few of the services offered.  (Noe Suppl. Decl. ¶¶ 6, 7; ECF No. 105-1.)  In fact, a majority of EJM's clients have selected less than the full range of EJM's services.  (*Id.* ¶ 7.)  And though the United States points to management agreements in the record that show clients have retained certain critical services, these contracts reflect a client's individual decision as to what services it wishes EJM to provide.  (*Id.* ¶ 5.)

Similarly, the Court looks to which party provides the crew to operate the aircraft. Revenue Ruling 68-256 provides that if an aircraft owner enters into a "wet lease" with a lessee—meaning the owner provides the crew—then the owner retains control of the aircraft.

Rev. Rul. 68-256, 1968-1 C.B. 489, 1968 WL 15396, at *2 (1968); *see also* Rev. Rul. 76-394,

1976-2 C.B. 355, 1976 WL 36862, at *2 (1976) ("Since in each situation the title and registration

of the aircraft is in the name of X company as owner of the aircraft, and the pilot and crew are on

X's payroll, X company is deemed to have the essential elements of possession, command and

control."). But when an aircraft owner enters a dry lease with a lessee—meaning the lessee

provides its own crew—then the lessee is thought to control the aircraft. *Id.* Again, the record

remains unclear as to who prevails on this factor. EJM provides some clients with pilots and

crew and is responsible for their compensation. (Aircraft Management Agreement §§ 6.1, 6.2,

6.4; ECF No. 93-3.) But, EJM clients retain approval authority over the crew, and many other

owners already have their own flight crews and need no assistance from EJM. (Noe Suppl. Decl.

¶ 8.) More, an owner may even pilot her own plane provided she is appropriately licensed, and

thus may not need a flight crew. (Noe Decl. ¶ 28; ECF No. 62-1.)

Another factor that the Court considers is the nature of the transportation services that

EJM offers. In Revenue Ruling 74-123, an aviation company provided transportation services to

a client on some aircrafts owned by the aviation company and others owned by the client. The

aviation company operated aircraft on scheduled flights between definite points, provided the

pilots and crew, performed maintenance, maintained insurance, and was responsible for the

operating expenses such as fuel. "When the company use[d] its own aircraft . . . , amounts paid

for the service rendered [were] clearly subject to the tax." The IRS also ruled that "the mere fact

that the company" used client-owned aircraft "rather than its own . . . is not sufficient to change

the *nature of the service* as 'taxable transportation,'" and thus the tax was also assessed to

payments received for transportation services rendered on client-owned aircrafts. *Id.* (emphasis

added).

The United States argues that the tax treatment for owners of the aircraft should be the same as that of third-party charter customers, who do pay the § 4261 taxes, because EJM offers both sets of clients the same service. (*See* EJM Reply at 4; ECF No. 79 (acknowledging that "[w]hen EJM is using an aircraft for a charter flight, it has possession, command and control of the aircraft because it is providing the charter customer with both an aircraft and the pilots necessary to operate it.")).  But the United States points to no evidence of what services EJM offers third-party customers.  And even if it did, aircraft owners select what services they want on an a la carte basis.  Thus, the Court cannot verify the United States' assertion that the services offered are identical.

For its part, EJM wants the Court to focus on the fact that its clients own their aircraft and therefore have possession, command, and control of the planes.  But this alone does not quell the genuine issues discussed above.  Ownership of the aircraft, while a factor to consider, is not dispositive.  *See* Rev. Rul. 74-123, 1974-1 C.B. 318, 1974 WL 34732, at *2 ("[T]he mere fact that the company uses [client]-owned aircraft rather than its own in carrying out the contract is not sufficient to change the nature of the service as 'taxable transportation.'").  And, the Court notes that owners have the right to fly on charter planes that they do *not* own.

Last, EJM points to its management agreement, which it claims spells out the owner's possession of and control over the aircraft.  The agreement states that the owner "rightfully possesses" its aircraft and "retain[s] operational control and possession, command and control" of its aircraft. (Management Agreement at 1; ECF No. 62-1).  But parties to a private contract cannot, by agreement, change the tax law.  As outlined above, the record reflects a genuine issue as to who has possession, command, and control such that the Court cannot verify the contract's legal conclusions.

**C. Transportation Excise Tax and the Fuel Excise Tax**

In its Reply memorandum, the United States raises an alternative reason why EJM owes § 4261 taxes: the tax code's different treatment of non-commercial flights, in which only fuel taxes apply, and commercial flights, in which some combination of the fuel tax and the transportation excise tax apply. This argument borrows from *Executive Jet Aviation v. United States*, 125 F.3d 1463 (Fed. Cir. 1997), where the court determined that if transportation was commercial transportation under the fuel-excise-tax provisions, then it was also subject to § 4261. *Id.* at 1465, 1468. Title 26 U.S.C. § 4041(c) defined commercial aviation (as an exception to non-commercial travel) as "any use of an aircraft . . . in a business or transportation of persons or property for compensation or hire by air." *Id.* at 1468. In *Executive Jet*, the court determined that the fractional ownership program was in the "business of transporting persons or property for hire by air" and consequently § 4261 applied. *Id.* at 1469.

The United States argues that EJM similarly is in the "business of transporting persons or property for hire by air" and thus is subject to § 4261. But the United States raised this argument for the first time in its Reply memorandum. (*See* Reply at 13-15; ECF No. 112.) As this Court has previously explained, "a reply brief is not the proper place to raise an issue for the first time." *United Tel. Co. of Ohio v. Ameritech Servs., Inc.*, No. 2:10-cv-249, 2011 WL 53462, at *3 n.2 (S.D. Ohio Jan. 7, 2011); *cf. Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986) ("Plaintiff's argument on this issue was raised for the first time in his reply brief. Accordingly, it will not be considered on appeal."). "An issue raised for the first time in a reply brief has not been fully briefed, and thus, is not appropriate for decision." *Baker v. Union Twp., Ohio*, No. 1:12-CV-112, 2013 WL 4502736, at *13 (S.D. Ohio Aug. 22, 2013) (refusing to consider issue not raised in summary judgment motion). Thus, the Court will not address this argument on the

merits.  *See Tonguette v. Sun Life & Health Ins. Co. (U.S.)*, No. 2:12-CV-00006, 2013 WL 1818620, at \*4 (S.D. Ohio Apr. 29, 2013) (collecting cases that refused to consider arguments raised for the first time in a reply memorandum).

### IV. CONCLUSION

For these reasons, the United States' motion for summary judgment (ECF No. 103) on the standing issue is **DENIED**.  The United States' motion for summary judgment (ECF No. 103) on the issue of whether NetJets provides taxable transportation under § 4261 is **GRANTED** and NetJets' motion for summary judgment on this issue (ECF No. 61) is **DENIED**.  The United States' and EJM's motions for summary judgment (ECF Nos. 62 and 93) on the issue of whether EJM provides taxable transportation are **DENIED**.  And, NetJets' motion for summary judgment (ECF No. 61) on the 1992 TAM issue is **GRANTED** and the United States' motion for summary judgment (ECF Nos. 103) on the 1992 TAM issue is **DENIED**.

**IT IS SO ORDERED.**

\_\_\_\_\_1- 26 - 2015_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**

37